1  LANCE A. ETCHEVERRY (SBN 199916)
   Lance.Etcheverry@skadden.com
2  CAROLINE VAN NESS (SBN 281675)
   Caroline.VanNess@skadden.com
3  ASHLEY PHILLIPS (SBN 318397)
   Ashley.Phillips@skadden.com
4  SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
5  525 University Avenue, Suite 1400
   Palo Alto, CA 94301
6  Telephone:  (650) 470-4500
   Facsimile:   (650) 470-4570
7
8  *Attorneys for Plaintiffs*
   PACASO INC., 13 CA GRIZZLY LLC,
9  5 CA GRIZZLY LLC, 2 CA GRIZZLY
   LLC, 3803 MARCUS AVENUE LLC,
10 307 GOLDENROD AVENUE LLC,
   1703 PLAZA DEL SUR LLC, PAC 31 CA
11 2021 LLC, PAC 30 CA 2021 LLC, and
   PAC 11 CA 2021 LLC

12              **UNITED STATES DISTRICT COURT**

13           **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  PACASO INC., 13 CA GRIZZLY LLC, 5 CA GRIZZLY LLC, 2 CA GRIZZLY LLC, 3803 MARCUS AVENUE LLC, 307 GOLDENROD AVENUE LLC, 1703 PLAZA DEL SUR LLC, PAC 31 CA 2021 LLC, PAC 30 CA 2021 LLC, and PAC 11 CA 2021 LLC | Case No.: 8:23-cv-01762 |

15  Case No.: 8:23-cv-01762

16  **COMPLAINT FOR:**

17  **(1) DECLARATORY JUDGMENT: EXEMPTION FROM THE ORDINANCE;**

18  Plaintiffs,

19  **(2) DECLARATORY JUDGMENT: INAPPLICABILITY OF THE ORDINANCE;**

20  v.

21  THE CITY OF NEWPORT BEACH.

   **(3) SELECTIVE ENFORCEMENT;**

22  **(4) INVALID USE OF MUNICIPAL AUTHORITY;**

23  Defendants

   **(5) PREEMPTION;**

   **(6) DUE PROCESS VIOLATION;**

24  **(7) VIOLATION OF THE RIGHT OF PRIVACY; and**

25  **(8) DECLARATORY RELIEF: VIOLATIONS OF THE CALIFORNIA COASTAL ACT.**

26

27  **JURY TRIAL DEMANDED**

28

---

COMPLAINT                                                    CASE NO. 8:23-cv-01762

Plaintiffs Pacaso Inc., a Delaware corporation, and 13 CA Grizzly LLC, 5 CA Grizzly LLC, 2 CA Grizzly LLC, 3803 Marcus Avenue LLC, 307 Goldenrod Avenue LLC, 1703 Plaza Del Sur LLC, PAC 31 CA 2021 LLC, PAC 30 CA 2021 LLC, and PAC 11 CA 2021 LLC (collectively, "Pacaso" or "Plaintiff"), for their Complaint against the City of Newport Beach (the "City" or "Newport Beach" or "Defendant"), allege based on personal knowledge and on information and belief as follows:

## INTRODUCTION

1.  This case arises out of Defendants' attempts to meddle with and violate Pacaso and its homeowners' protected rights to share ownership of a single-family home with others.

2.  On May 23, 2023, Newport Beach enacted Ordinance Numbers 2023-4 and 2023-5, which amended Title 20 (Planning and Zoning) and Title 21 (Local Coastal Program Implementation Plan) of the Newport Beach Municipal Code ("NBMC") Related to Time Shares (collectively, the "Ordinance"). The Ordinance transforms the definition of "time share" to expressly determine that "the fractional ownership use of a home is a time share." The purpose of the Ordinance is single fold: to preclude Pacaso and its homeowners from enjoying the benefits of second home ownership in Newport Beach—a privilege that is commonplace in Newport Beach, both among those in the upper echelon of financial status, who can afford to purchase and own primary and second homes in Newport Beach on their own, despite the astronomical housing prices in the area, and among friends and/or family who co-own homes together.

3.  The City attempts to draw a distinction that is legally meaningless, based upon whether the home is co-owned among friends and/or family, and whether the homeowners have entered into a formal agreement governing their ownership and use of the home. But this parameter belies the fact that the City's attempt to regulate homes like Pacaso's is not based on the use of the home. Indeed, nowhere in the City's legislative materials does it explain why a fractionally owned home governed by a

"formal agreement" results in different, and more problematic, effects, than a home that lacks such documentation, or why the identity of the co-owners is relevant whatsoever.  Nor could it.  Plainly, the sophistication of the co-owners' arrangement, and the identities of the co-owners, is totally irrelevant to the matters which the City can permissibly regulate through a zoning ordinance.

4.    Thus, because the Ordinance threatens property rights and interferes with Pacaso's homeowners' ownership of property in Newport Beach and their ability to use their homes consistent with the rights of all other homeowners within the City, Pacaso has no choice but to seek judicial intervention to guarantee the legally and constitutionally protected rights of its homeowners to enjoy the benefits of owning property in the beautiful surrounds of Newport Beach.

5.    The City's attempt to restrict Pacaso and its homeowners is based on incorrect theories about both the scope of the Ordinance, as well as Pacaso's business model.  The Ordinance purports to prohibit time shares, but Pacaso homes are not time shares.

6.    Pacaso has introduced a new pathway for second home ownership that provides individuals who have traditionally been excluded from the second home market an opportunity to turn their dreams into reality.  Pacaso eliminates several significant barriers to second home ownership, including exorbitant costs, inevitable maintenance hassles and even the perceived guilt of having the home sit vacant.  Pacaso prides itself in serving a diverse clientele, underscoring the power of ownership to unlock new opportunities for traditionally underrepresented communities.  Its owner group is organically diverse: many of Pacaso homeowners in Newport Beach are non-white or identify as LGBTQ+.

7.    Pacaso homes also concentrate demand into more expensive properties, which benefits the housing market overall and mitigates pressure on the median-priced housing market.  All Pacaso homes in Newport Beach were sold by single owners at prices that exceed $4,100,000.  In contrast, the median cost of a single-family unit

3

homes and condominiums in Newport Beach was around $2.4 million.  *See* Ordinance 2023-4 at 2.

8.      Pacaso's homeowners are not renters or investors.  They ***co-own*** the home with up to seven other homeowners.  Pacaso's co-homeownership structure has no resemblance to commercial or quasi-commercial use.  Pacaso homeowners are true homeowners who make a significant financial investment in their home—and they are in it for the long haul.  They are directly invested in the home and its surrounding neighborhood and community, and own for their personal use and enjoyment, not for profit.  Pacaso homeowners are strictly prohibited from renting out the property at any point to anyone.

9.      Unlike absentee second home owners, Pacaso homeowners occupy their home and support local businesses year-round, just like a primary residence.  What is more, Pacaso itself employs between 8 to 10 local businesses per property, including real estate agents, property managers, landscapers, pool cleaners, home cleaners, laundry services, handymen, local artists and more.  This increased local spending generates significant economic benefits for the City.  Pacaso homeowners, as invested homeowners, are active members of the community of Newport Beach and are motivated to better the community.  In sum, Pacaso's homeowners are part and parcel of the underlying social fabric and economic ecosystem of Newport Beach.

10.     Pacaso is—and has always been—fully compliant with, and committed to upholding, the laws and values of Newport Beach.  Despite the obvious opportunities to develop a fruitful partnership, the City has nevertheless failed to embrace Pacaso and its homeowners as the equal community members they are.  Instead, they have taken aim at Pacaso, seemingly at the behest of a few vocal Newport Beach residents with improper bias against outsiders.

11.     In light of the City's largely homogenous community, the City's attempt to meddle in property co-ownership (especially among Pacaso's clientele) is deeply concerning.  The City's enforcement agenda infringes on homeowners' constitutional

4

1  and privacy rights to associate and cohabitate with persons of their choosing,
2  effectuates an unnecessary barrier to entry for new homeownership opportunities, and
3  directly stifles diverse individuals' access to owning real property in Newport Beach.

4      12.    As set forth below, the City's amendment to its time share ordinance so
5  as to "modif[y] the definition of time share to clearly include fractional ownership
6  units" like Pacaso's is unlawful, and any attempt to prohibit Pacaso and homeowners
7  from owning their residence through a co-homeownership model under the Ordinance
8  is flawed for several reasons—not the least of which is that the regulation runs afoul
9  of the law and infringes property and privacy rights.  (Newport Beach City Council,
10 Staff Report *Ordinance Nos. 2023-4 and 2023-5: Code Amendments Related to Time*
11 *Shares (PA2022-0202)* 1 (May 9, 2023) (hereinafter the "May 9, 2023 Report").)

12                                      **THE PARTIES**

13     13.    Pacaso is a corporation formed under the laws of Delaware, doing
14 business as "Pacaso," and headquartered in San Francisco, California.  Pacaso, which
15 previously operated under the brand name "Niner Homes," first started operations in
16 2020.  It launched as Pacaso in October 2020.  At the inception of this action, Pacaso
17 owns and/or manages nine single-family homes in the City of Newport Beach, located
18 at (1) 4106 River Ave., Newport Beach, 92663; (2) 305 Grand Canal, Newport Beach,
19 92662; (3) 506 W Oceanfront, Newport Beach, 92661; (4) 3803 Marcus Ave., Newport
20 Beach, 92663; (5) 307 Goldenrod Ave., Newport Beach, 92625; (6) 1703 Plaza Del
21 Sur, Newport Beach, 92661; (7) 2628 Ocean Blvd., Newport Beach, 92625; (8) 117
22 25th St., Newport Beach, 92663; and (9) 121 Emerald Ave., Newport Beach, 92662.

23     14.    13 CA Grizzly LLC, a California limited liability company, is the
24 property-specific LLC that owns deeded title to 4106 River Ave., a single-family
25 residence located in Newport Beach.

26     15.    5 CA Grizzly LLC, a California limited liability company, is the property-
27 specific LLC that owns deeded title to 305 Grand Canal, a single-family residence
28 located in Newport Beach.

16.     2 CA Grizzly LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 506 W Oceanfront, a single-family residence located in Newport Beach.

17.     3803 Marcus Avenue LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 3803 Marcus Ave., a single-family residence located in Newport Beach.

18.     307 Goldenrod Avenue LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 307 Goldenrod Ave., a single-family residence located in Newport Beach.

19.     1703 Plaza Del Sur LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 1703 Plaza Del Sur, a single-family residence located in Newport Beach.

20.     PAC 31 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 2628 Ocean Blvd., a single-family residence located in Newport Beach.

21.     PAC 30 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 117 25th St., a single-family residence located in Newport Beach.

22.     PAC 11 CA 2021 LLC, a California limited liability company, is the property-specific LLC that owns deeded title to 121 Emerald Ave., a single-family residence located in Newport Beach.

23.     The City of Newport Beach is located in the coastal center of Orange County.  The City of Newport Beach was incorporated September 1, 1906, and the current City Charter was adopted in 1954.  The City operates under a Council-Manager form of government.  (City of Newport Beach, About The City of Newport Beach, https://www.newportbeachca.gov/government/departments/public-information-office/about-newport-

6

1  beach#:~:text=The%20City%20of%20Newport%20Beach%20was%20incorporated
2  %20September%201%2C%201906,the%20population%20as%20a%20whole.)

3                    **JURISDICTION AND VENUE**

4       24.    As this case involves questions that arise under the U.S. Constitution and
5  the laws of the United States, the jurisdiction of this court is invoked pursuant to 28
6  U.S.C. § 1331. This action is authorized by 42 U.S.C. § 1983.  The Court has
7  jurisdiction to issue relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§
8  2201, 2202.  This court has jurisdiction to hear Plaintiffs' pendent state claims through
9  the doctrine of supplemental jurisdiction set forth at 28 U.S.C. § 1367.

10      25.    This district is the proper venue and jurisdiction to the location of the
11 Defendant, and the location where the injury occurred, under 28 U.S.C. § 1391(b).

12                   **GENERAL ALLEGATIONS**

13 **I.     Pacaso Seeks To Democratize Second Home Ownership In Newport Beach**

14      26.    Pacaso (formerly known as Niner Homes) launched in October of 2020,
15 introducing a new pathway for second home ownership.

16      27.    Pacaso currently either partially owns and/or manages nine single-family
17 homes in the City of Newport Beach.

18      28.    Pacaso lowers the barriers to the second home market by simplifying and
19 streamlining the co-ownership process by reducing costs and making ownership
20 possible at a more accessible price point.  Pacaso organizes the ownership group,
21 manages the legal process and provides a management service to streamline the
22 homeownership process for the co-owners.

23      29.    Pacaso further facilitates broader access to the second home market by
24 allowing co-owners to buy partial interests in real property.  Pacaso creates a property-
25 specific LLC for each home, which owns deeded title to the real property.  Then Pacaso
26 organizes and vets a maximum of eight co-owners, who hold co-ownership interests in
27 the LLC and co-own the home in increments ranging from 12.5% to 50%.

28

COMPLAINT                                                      CASE NO. 8:23-cv-01762

30.     The co-owners can purchase their desired ownership interest based on their expected occupancy needs and financial means, and even in certain circumstances their desire to participate in the LLC with co-owners of their choosing.  At closing, the co-owners enjoy 100% ownership in the property, and Pacaso's only role remains to serve, at the discretion of the homeowners, as program manager overseeing the LLC and employing local businesses to care for the home.

31.     The concept of co-ownership through an LLC is far from new.  In Newport Beach, property ownership through LLCs or other vehicles that facilitate multiple owner arrangements is very common.  But Pacaso simplifies the process in a novel way that makes the experience accessible to people who lack the resources or time to own and manage a whole second home.  As a result, Pacaso has made second home ownership available to a broader set of people, including those in traditionally diverse and underrepresented communities.

32.     Pacaso specializes in top second home destinations and is currently focused on 29 markets across 11 states.  In short, Pacaso's model seeks to enrich the lives of new and diverse second home owners and open the second home market, which has traditionally been accessible only to affluent and predominantly white buyers.

33.     This is especially true in Newport Beach.  In Newport Beach, second home ownership has typically been possible only for elite and predominantly white buyers, particularly in the coastal region.   In contrast, Pacaso's owner group is organically diverse: many of Pacaso's total owner group are non-white or identify as LGBTQ+.

## II.    Pacaso Shifts Demand Away From The More Limited Supply Of Affordable Homes And Ensures Second Homes Are Fully Utilized

34.     Pacaso's approach helps relieve competition for more affordable homes by giving second home buyers a better option.  Instead of competing for a whole home valued at $525,000, for example, Pacaso offers second home buyers an option to be co-owners of a $4–9 million property for the same price.  Just one Pacaso home can

8

remove up to eight buyers from local competition. The average Pacaso home costs six times more than the average second home and seven times more than the average year-round home, meaning the company is unlikely to compete with middle-class or lower-income homebuyers. *See* EBP, *Pacaso: Pacaso Economic Impact Analysis* at 2 (2022), https://downloads.ctfassets.net/n2ifzifcqscw/6xq482ojqUgEi5fxtMsHka/ab875d46f4 7db2b6936ccf4d7d6b4b89/Economic_Data_Report.pdf.    Through co-ownership, Pacaso concentrates demand for the most expensive homes in popular second home destinations, thereby shifting demand away from the median-priced market. *Id*. at 7.

35.    Second homes are notorious for sitting empty much of the year. In contrast, Pacaso-managed homes are fully utilized, which means that Pacaso homeowners engage in their community and contribute to the local economy year-round.

36.    Just like their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a vacation mentality, to their use of the property. Short-term rentals are strictly prohibited, and all owners agree to Pacaso's policies, which prohibit large events or parties. A Pacaso home in Newport Beach is subject to all of the same noise and nuisance ordinances that apply to other single-family residences.

**III.    Pacaso Could Not Be Regulated Under The City's Previous Time Share Ordinance, Which Regulated Large Commercial Time Share Developments, Unlike Pacaso**

37.    The City's previous time share ordinance at Section 20.48.220, titled "Time Share Facilities," "provide[d] regulations for time share developments," which was intended to regulate massive, resort-type commercial developments of more than 100 units with recreational amenities, rather than a single-family residence shared among 8 or fewer owners.

38.    The code section laid out a requirement for "Minimum Number of Units" of a time share facility, which provided: "Each time share project shall have a ***minimum of one hundred (100) time share units***. Time share projects consisting of

9

less than one hundred (100) units, but developed or converted **in conjunction with a resort hotel complex of three hundred (300) or more units**, shall be considered to be in compliance with this requirement." NBMC § 20.48.220(A)(3) (emphasis added).

39. In contrast, a Pacaso home is a single-family residence shared among 8 or fewer co-owners, not a project including more than 100 units or established in conjunction with a resort hotel complex of at least 300 units.

40. The code section also laid out a requirement for "Required Amenities," stating: "Time share projects shall be developed with substantial recreational amenities (e.g., golf courses, tennis courts, swimming pools, etc.)." NBMC § 20.48.220(B). Again, in contrast, a Pacaso home is merely a single-family residence with no large-scale recreational amenities.

41. Further, Pacaso's small co-ownership model is starkly different from any "time share developments" purportedly covered by the City's previous time share ordinance or that is properly the subject of *any* zoning regulation. NBMC § 20.48.220.

42. Pacaso creates a property-specific LLC for each home, which owns deeded title to the property. Then Pacaso organizes and vets a maximum of eight co-owners, who have an ownership interest in the LLC and co-own the home in increments ranging from 12.5% to 50%. The co-owners can purchase their desired ownership interest based on their expected occupancy needs, financial means, and even in certain circumstances their desire to participate in the LLC with co-owners of their choosing. At closing, the co-owners enjoy 100% ownership in the property, and Pacaso's only role remains as program manager overseeing the LLC.

43. Just like any other residential homeowner, Pacaso homeowners own a real property asset in a single-family home that includes real property interests, rights and obligations. An interest in a time share project is vastly different from the rights inherent to real property co-ownership, including possession, control, exclusion, and disposition.

44.     Pacaso homeowners have inherent and inalienable rights inherent to owning property, which include the right to possession, to control, to use and quiet enjoyment, to privacy and to exclude others, to sell the property, to physically be on the property, to leave the property, to choose who else can be on the property, to build or alter the property, to make improvements or refurbish the property, and to sell or dispose of the property, among many other rights.

45.     Further, an owner of a "time share" interest, as opposed to an owner of a single-family home, is typically a member of a large commercial development of density, whereby multiple unrelated occupants are using the overall property at the same time. Owners of "time share" interests do not buy for the purposes of real estate ownership, but instead buy for purposes of enjoying or benefiting from the time share development or amenities—which is the exact type of activity covered by the City's previous time share ordinance.

46.     Pacaso's involvement in management of the home (which occurs only at the election of the home's co-owners, and remains subject to their ongoing choice) does not change the nature of the homeowners' interests and rights. Pacaso supports owners as a manager, making the homeowners' ownership experience seamless through the LLC and providing property management services, interior design, scheduling service, and concierge services. In fact, if Pacaso homeowners collectively agree that Pacaso's services are no longer desired, the owners can choose to terminate their relationship with Pacaso and self-manage their property. Thus, the City's contrived distinction between whether homeowners "split the allowed time at the property through a formal arrangement," versus those who "have no formal arrangement for occupancy" is meaningless as applied to Pacaso homes.

47.     Pacaso homeowners' ability to stay in the home is not capped. Subject to availability, a Pacaso co-owner can spend more time in the house, beyond the default time which would be solely attributable to each co-owner's ownership stake. Co-owners' ability to spend time in the home is fluid and flexible.

48.     Further, Pacaso homeowners are true owners with complete control of their home and expansive rights.  For example, Pacaso homeowners have the right to store their personal possessions on the property year round.  Pacaso homeowners are also heavily involved in all levels of management and decision-making regarding the property.  They vote on matters such as selecting and replacing the manager, renovations on the home or other changes to the interior or exterior design, and various other fundamental homeownership matters.  Co-owners can even sell the home outright.  Pacaso's management is merely a service.  Ultimately, Pacaso homeowners have complete control.

49.     It is therefore clear that Pacaso's properties did not fall within the purview of the City's prior time share ordinance, which on its face did not apply to real property co-ownership structures like Pacaso's, but rather applied to large commercial time share developments.

50.     The City never attempted to regulate Pacaso under this previous time share ordinance, nor could it.

## IV.    The City Amended Its Time Share Ordinance In An Attempt To Regulate Pacaso

51.     On November 16, 2021, the Newport Beach City Council conducted a study session to discuss fractional ownership.  (Attach. D to May 9, 2023 Report, Compiled Meeting Minutes (hereinafter the "Compiled Minutes"), November 16, 2021 City Council Meeting Minutes, at 12-611–12.) The Council heard public testimony and directed staff to monitor current fractional ownership and investigate how other jurisdictions were handling it.  *Id.* at 12-611.  Pacaso's then Director of Government and Community Relations Ellen Haberle gave a presentation about Pacaso, and City Council members asked questions.  *Id.*  Community Development Director Jurjis agreed to seek collaboration with fractional homeownership companies like Pacaso. *Id.*

52.    On September 13, 2022, the City Council conducted a second study session on fractional ownership, and directed staff to present a code amendment to revise the Newport Beach Municipal Code to restrict the use.  (Compiled Minutes, September 13, 2022, at 12-615–17.)  A representative for Pacaso clarified Pacaso's business model for the Council.  *Id.* at 12-615.

53.    On September 27, 2022, the City Council adopted Resolution 2022-61 initiating amendments to Title 20 and Title 21 of the City of Newport Beach Municipal Code Related to Fractional Homeownership, and directed staff to work with the Planning Commission to develop regulations that would regulate fractional ownership. (Compiled Minutes, September 27, 2022 Meeting Minutes, at 12-619–23.)  At the meeting, Councilmember Dixon announced that she had met with a Pacaso representative and discussed options.  Pacaso's Public Affairs Manager explained to the Council that Pacaso is not a timeshare business model, he elaborated that co-ownership is common and has been present for decades, and he expressed his interest in meeting with staff to reach a mutually agreeable policy.  *Id.* at 12-619.  Several other Pacaso employees read letters on behalf of various Pacaso fractional owners and supporters.  *Id.* at 12-619–21.

54.    On October 6, 2022, the Planning Commission conducted a study session to discuss fractional ownership uses.  (Compiled Minutes, October 6, 2022 Meeting Minutes, at 12-626–31).  The Commission expressed an intention to form an Ad-Hoc Committee to work with staff to formulate appropriate regulations.  The Public Affairs Manager for Pacaso utilized a presentation to demystify areas of Pacaso's business model and review co-ownership practices.  Various Pacaso employees read letters of support from Pacaso owners and supporters.

55.    On October 20, 2022, the Planning Commission formed an Ad-Hoc Committee.  The committee met seven times over the following four months to discuss potential regulations.  Representatives from Pacaso met with the Ad-Hoc Committee

during this time. (Compiled Minutes, October 20, 2022 Meeting Minutes, at 12-633–34).

56. During this process, Pacaso proposed an ordinance regulating Pacaso-managed homes to address many of the City's concerns and recommend a cap of about 500 fractional ownership homes City-wide. (Ex. P to May 9, 2023 Report, Ordinance Proposed by Pacaso Adding Chapter 5. 98, at 12-280–91

57. On February 23, 2023, despite such discussion and Pacaso's proposed ordinance, the Ad-Hoc Committee nevertheless presented its findings to the Planning Commission and recommended that the City Council "broaden the definition of timeshares and include fractional ownership [uses]," and thereby prohibit them in residential zoning districts. (Compiled Minutes, February 23, 2023 Meeting Minutes, at 12-638.) The Planning Commission also presented an alternative recommendation to create a separate regulatory scheme to allow fractional ownership in all zones except Single-Unit Residential (R-1) zones. *Id.* The Senior Public Affairs Manager for Pacaso thanked staff and the planning commission for working collaboratively and noted the draft regulation that Pacaso prepared. *Id.* She also relayed the difference of a Pacaso home versus a timeshare and described the characteristics of a fractional owner. *Id.*

58. On March 14, 2023, the City Council discussed the Planning Commission's recommendations and directed staff to move forward with a code amendment to implement the Planning Commission's preferred recommendation and broaden the definition of time shares to include fractional ownership uses, effectively prohibiting them from all residential zones. (Compiled Minutes, March 14, 2023 Meeting Minutes at 12-645.) Pacaso employees read comments and letters of support from Pacaso owners and a local business owner. *Id.* at 12-641–45.

59. On April 20, 2023, after the Planning Commission held a public hearing to discuss the draft zoning code and Local Coastal Program amendments, the Planning Commission recommended approving the amendments and suggested two additional

14

changes: (1) that the city prohibit advertising time shares, and (2) that the city clarify the time share definition to ensure it does not include shared vacation homes by family or friends.  (City of Newport Beach, Newport Beach Planning Commission Minutes at 4–5 (April 20, 2023); City of Newport Beach, Planning Commission Meeting: April 20, 2023, YouTube, at 1:21:35–1:22:08 (Apr. 21, 2023), https://youtu.be/Bd81u0usDd4?t=4863 (hereinafter "(April 20, 2023 Planning Commission Meeting")).)  A senior public affairs official from Pacaso spoke during the public comment period to distinguish between short term rentals and co-ownership, and she offered to work with the city to come up with a mutually beneficial solution. (April 20, 2023 Planning Commission Meeting at 55:05–58:04.)

60.    On May 9, 2023, counsel for Pacaso submitted a letter to the City of Newport Beach urging the City not to pass the Ordinance on multiple grounds, including hat it threatens property rights, it is unconstitutional under both the federal constitution and California constitution, it exceeds the City's police power, and it violates the Coastal Act.  (*Agenda Packet, Item 12 - Code Amendments Related to Time Shares (PA2022-0202 – Correspondence (Pacaso))*, City of Newport Beach, (May 9, 2023),

https://ecms.newportbeachca.gov/WEB/DocView.aspx?id=2872748&dbid=0&repo=CNB.

61.    On May 9, 2023, the City Council presented the proposed amendments to the definition of time shares in the Newport Beach Municipal Code Section 20.48.220(A).  During the presentation, the City utilized a PowerPoint presentation to make an edit to the proposed definition in response to some of the concerns raised in Pacaso's counsel's May 9, 2023 letter.  The modification added the term "responsible" to Section 20.48.220(A), and narrowed the restriction on "[a]dvertis[ing] or caus[ing] to be printed, published, or disseminated" to a "responsible person" who "receives or will receive an economic benefit from the sale."  (Ex. W to May 9, 2023 Report at 12-299; Ex. W to Ordinance 2023-4.)  The City then opened the public hearing for

COMPLAINT                                                                                    CASE NO. 8:23-cv-01762

comment, and a Pacaso employee urged the city to consider the letter submitted by Pacaso's counsel and not move forward with the Ordinance.  She offered to partner with the City as a resource to explore other regulatory options.  Mayor Blom then closed the public hearing and the motion carried unanimously.  The amendment then passed to a second reading on May 23, 2023.

62.    On May 23, 2023, the ordinance was adopted by the Newport Beach City Council.  The proposed ordinance went into effect 30 days after its adoption, on June 22, 2023.

## V. **The Recently Enacted Ordinance Does Not Apply To Pacaso, As Confirmed By Its Definitions And The City's Stated Purposes Underlying The Ordinance**

63.    Like the City's former time share ordinance, the recently enacted Ordinance does not apply to Pacaso or Pacaso homeowners.  Section 20.48.220(A) provides:

No time share use or time share unit shall be established or permitted in any zoning district except as authorized in the Code.  Unless authorized by this Code, no responsible person including, but not limited to, an owner of a time share unit, an agent, or broker shall:

1. Develop or establish a timeshare use in the City;

2. Convert a property or unit in the City to a time share use or time share unit;

3. Advertise or cause to be printed, published, or disseminated in any way and through any medium, the availability for sale, in its entirety or a fraction thereof: (a) any property or unit in the City that is used for a time share use or as a time share unit; or (b) any entity where the ownership thereof, in whole or in part, entitles the owner thereof to use a property or unit in the City for a time share use; if the responsible person receives or will receive an economic benefit from the sale and/or

16

4. Manage a unit or property in the City that is being used for a time share use or as a time share unit.

(Ex. W to Ordinance 2023-4.)

64.    Under the recently enacted Ordinance:

65.    A "[t]ime share use" is defined as "the use of one or more time share accommodations or any part thereof, as a time share property." *Id.*

66.    A "[t]ime share property," means "one or more time share accommodations subject to the same time share instrument, together with any other property or rights to property appurtenant to those time share accommodations." *Id.*

67.    A "[t]ime share instrument," in turn, means "***one or more documents***, by whatever name denominated, creating a time share plan or governing the operation of a time share plan, and includes the declaration dedicating time share accommodations to the time share plan." *Id.* (emphasis added).

68.    In turn, a "time share plan" is defined as "any arrangement, plan, scheme, or similar device . . . whereby a purchaser, in exchange for consideration, receives the right to exclusive use of real property, or any portion thereof, whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years. A time share plan shall be deemed to exist whenever such recurring rights of exclusive use to the real property, or portion thereof, are created, regardless of whether such exclusive rights of use are a result of a grant of ownership rights, possessory rights, membership rights, rights pursuant to contract, or ownership of a fractional interest or share in the real property, or portion thereof, and regardless of whether they are coupled with ownership of a real property interest such as freehold interest or an estate for years in the property subject to the time share plan." *Id.*

69.    Taking these definitions together, the May 9, 2023 Report states that a "time share plan" is defined as "'any arrangement, plan, scheme, or similar device' that

COMPLAINT                                                                     CASE NO. 8:23-cv-01762

1  limits the owner to the right for 'exclusive use of real property, or any portion thereof'

2  for 'less than a full year during any given year, on a recurring basis for more than one

3  year.'  This means the use of any real property in which an owner has exclusive use of

4  said property for less than the full year would be classified as a time share."  (May 9,

5  2023 Report at 12-3.)

6      70.    However, a Pacaso homeowner and their use of their Pacaso home does

7  not fall within any of these definitions.  Under the relevant agreements governing

8  Pacaso homeowners, a Pacaso homeowner does not, "in exchange for consideration,

9  receive the right to exclusive use of [a Pacaso home], whether through the granting of

10 ownership rights, possessory rights or otherwise, for a period of time less than a full

11 year during any given year, on a recurring basis for more than one year, but not

12 necessarily for consecutive years"—as set out in the Ordinance.  Rather, Pacaso

13 homeowners' ability to spend time in their home is fluid, flexible and uncapped.

14     71.    Further, Pacaso's small co-ownership model is starkly different from any

15 "time share use" purportedly covered by the Ordinance, and thus does not apply to

16 Pacaso.  *See also supra* ¶¶ 41–50.  Pacaso homeowners do not merely own the "right

17 to exclusive use of real property, or any portion thereof . . . for a period of time less

18 than a full year during any given year, on a recurring basis for more than one year,"

19 NBMC § 20.70.020 (definition of "Time Share plan" in Ordinance 2023-4) , or

20 "recurring rights of exclusive use to the real property, or portion thereof," *id*.  As

21 explained above, this right is not granted in any of the agreements between Pacaso and

22 the Pacaso homeowners.  Further, Pacaso homeowners are actually true owners with

23 complete control of their home and expansive rights, who own a real property asset in

24 a single-family home that includes real property interests, and rights and obligations

25 shared among co-owners.  Such real property rights include the right to possession, to

26 control, to use and quiet enjoyment, to privacy and to exclude others, to sell the

27 property, to physically be on the property, to leave the property, to choose who else

28

can be on the property, to build or alter the property, to make improvements or refurbish the property, and to sell or dispose of the property, among many other rights.

72.     For example, Pacaso homeowners store their personal possessions on the property year round, are heavily involved in all levels of management and decision-making regarding the property, and vote on matters such as selecting and replacing the program manager, renovations on the home or other changes to the interior or exterior design, and various other fundamental homeownership matters.  Pacaso homeowners can also sell the home outright, and choose to not work with Pacaso if they wish. Ultimately, Pacaso homeowners have complete control.  These real property interests, rights and obligations of possession, control, exclusion, and disposition are distinct from and different than the "right to exclusive use" of a home as set out in the Ordinance.

73.     Pacaso's involvement in management of the home, at the election of the home's co-owners, does not change the nature of the homeowners' interests and rights. Pacaso supports owners as a program manager, making the homeowners' ownership experience seamless through the LLC and providing property management services, interior design, scheduling service, and concierge services.  In fact, if Pacaso homeowners collectively agree that Pacaso's services are no longer desired, the owners can choose to terminate their relationship with Pacaso and self-manage their property. Pacaso homeowners are jointly committed to the principle that the relaxed enjoyment of the Pacaso home is one of their foremost objectives.  This ownership structure facilitates a collaborative ownership experience with diverse individuals of their choosing.

74.     Further, the City's stated goals and Statement of Facts underlying the Ordinance further confirms that the Ordinance does not apply to Pacaso and its homeowners, and that enforcement against Pacaso and its homeowners would do nothing to further the City's goals.

COMPLAINT                                                              CASE NO. 8:23-cv-01762

75.    The City states that its amendment efforts were a "result of community concerns received regarding the commercialization of residential neighborhoods that fractional ownership uses create, including increases in traffic, parking, noise and trash" and their attempt to find the "best approach to address potential impacts." (May 9, 2023 Report at 12-2.)  Similarly, the Ordinance states that fractionally owned homes "result[] in an increase in traffic and noise in residential neighborhoods, as well a [sic] change to the fabric of the community due to the short-term nature of the stays," and that "public testimony included concerns about increases in traffic, noise, and trash." (Ordinance No. 2023-4, at 2, 4.)  Further, the Ordinance states that "fractionally owned homes are a time share and operate much like short-term lodgings," and "these homes operate as short-term lodging with residents expressing displeasure with the impacts that these homes were causing including an increase in the noise and traffic in the residential neighborhood."  (*Id*. at 3, 4.)

76.    However, prohibiting Pacaso does not further these goals.  In fact, Pacaso homeowners—by virtue of the policies they adopt when becoming a Pacaso homeowner (such as Pacaso home policies and good neighbor code of conduct policies)—likely cause less traffic, parking, or noise than other Newport Beach residents.  For example, Pacaso co-owners agree not to have large events or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy; co-owners agree not to rent the home to third parties; and Pacaso encourages homeowners to avoid parking on the street unless absolutely necessary.  If homeowners violate the Pacaso home policies, they can face monetary penalties.  Further, Pacaso homes are subject to all of the same noise, nuisance, parking and trash ordinances that apply to other single-family residences in Newport Beach and fully address these concerns.  *See*, *e.g.*, NBMC Chapter 10.50 (Public Nuisance Abatement); Chapter 10.26 (Community Noise Control); Chapter 20.40 (Off-Street Parking); Chapter 12.44 (Stopping, Standing and Parking Restrictions); Chapter 6.04 (Garbage, Refuse and Cuttings).

77.     Pacaso is a purely residential co-homeownership structure that lacks any resemblance to such "commercial" uses or "short-term lodgings."  Rather, Pacaso homeowners are strictly prohibited from any short-term rentals of their homes, and Pacaso homeowners are true homeowners who make a significant financial investment in their home—and they are in it for the long haul.  They are directly invested in the home and its surrounding neighborhood and community, and own for their personal use and enjoyment, not for profit.  Just like their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a "short-term" vacation mentality, to their use of the property.

78.     Council Member (and now sitting Mayor) Blom acknowledged this point and undercut the City's statements that Pacaso homeowners are "chang[ing] the fabric of the community" (Attach A to May 9, 2023 Report, Ordinance No. 2023-4, at 2), when he rightly expressed: "I don't see four or eight owners of a single house really destroying our city.  I feel like those people have actually put in $500,000 or a decent amount of money. . . .   We would love it if it was a single-family owner for every house; that's the old way . . . .  A lot of people that are maybe trying to create this life for themselves—maybe this is the best way to get to do it.  I don't think they are here to destroy our community.  I think they're here to enjoy it."  (City of Newport Beach, Newport Beach City Council Meeting: November 16, 2021, YouTube, at 54:22–58 (Nov. 17, 2021), https://youtu.be/nk1QT25nAUQ?t=3260.)

79.     In any event, the City lacks all visibility and control into how much time any homeowner—whether a co-owner or single owner—intends to spend in his or her home.  So, preventing Pacaso and its homeowners from buying properties has no bearing on the likelihood that other prospective buyers are either buying the home as a second home, or anticipating the ability to use it for short-term lodging, or for serial leases that are 31 consecutive days (thus exceeding the threshold length of time that defines short-term lodging).  Nor does regulating Pacaso impact whether other homeowners in Newport Beach are taking in multiple house guests, hiring live-in

nannies or staff, or selling their home to a family of fifteen, all of which, under the City's stated goal, would be more likely to lead to increased traffic, noise, or parking issues.

80.    The Ordinance and Statement of Facts underlying the amended time share ordinance further state that "[f]ractionally owned homes create impacts on the City's housing supply and character of residential neighborhoods," and that "[t]he fractional ownership of single-unit residences as a second home further exacerbates the housing supply in Newport Beach to meet housing demand."  (Ordinance No. 2023-4, at 2-3; Attach. E to May 9, 2023 Report, Planning Commission Resolution No.  Planning Commission Resolution No. PC2023-018, at 12-648.)  The Ordinance further states that "the fractional ownership of single-unit residences as a second home further exacerbates the housing supply in Newport Beach making it harder to meet housing demand." (Ordinance No. 2023-4, at 3.)

81.    However, prohibiting Pacaso does not advance the City's goals of meeting housing demand or increasing housing supply.   Rather, Pacaso helps relieve competition for more affordable homes by giving second home buyers a better option. Instead of competing for a whole home valued at $525,000, for example, Pacaso offers up to eight second home buyers an option to be co-owners of a $4–9 million property for the same price.  Just one Pacaso home can remove up to eight buyers from local competition.  Further, second homes are notorious for sitting empty much of the year. In contrast, Pacaso-managed homes are fully utilized, which means that Pacaso homeowners engage in their community and support local businesses year-round.

82.    Finally, the Ordinance mentions that "[u]nder this new model, the residence is owned in up to 1/8 shares with stays ranging from two to fourteen nights in duration resulting in frequent turnover of the properties' occupants and its commercial management."  (Attach. E to May 9, 2023 Report at 12-9, Planning Commission Resolution No. PC2023-018 at 12-647; Ordinance No. 2023-4 at 2 (similar).)

83.     However, targeting Pacaso does very little to alleviate any concerns about "frequent turnover." (*Id.*)  The City lacks all visibility and control into how much time homeowners intend to spend in their homes, the frequency with which a homeowner invites over guests, how many overnight visitors the homeowner has, and how frequently they have people coming in and out their home (including landscapers, professional cleaners, pool maintenance crews, etc.).  Preventing Pacaso from buying properties does nothing to prevent other prospective buyers from buying the home as a second home (or their fulltime residence) and using it the exact same manner as the Pacaso homeowners.

84.     Pacaso has the potential to be an excellent partner of the City.  Pacaso's new homeowners are part and parcel of the underlying economic ecosystem.  Unlike absentee second home owners, Pacaso owners occupy their home and support local businesses year-round.  Additionally, Pacaso itself employs between 8-10 local businesses per property, including real estate agents, property managers, landscapers, pool cleaners, home cleaners, laundry services, handymen, local artists, and more.

85.     These major disconnects between the goals and findings underpinning the Ordinance and Pacaso's model and the behavior of its homeowners underscores that the ordinance is nothing more than a pretext to deny homeownership to new owners. It is plain that many other preexisting regulations, ordinances, and policies address the supposed "concerns" the City had with certain residential properties that underlie the purpose and intent of the Ordinance.

**VI.     Because Pacaso Homes Were Permissible Under The City's Previous Time Share Ordinance, Existing Pacaso Homes Are Permitted To Continue Indefinitely Under the Recently Enacted Ordinance**

86.     The Ordinance specifically states that it "shall not apply to any time share use that was lawfully established prior to the effective date" of the Ordinance.  *See* Ex. W to Ordinance 2023-4 (§ 20.48.220(A)).

87.     Thus, even if the newly enacted Ordinance applied to Pacaso and its homeowners (it does not), the homes that Pacaso owned and/or managed prior to and

at the time that the Ordinance was enacted, located at (1) 4106 River Ave., Newport Beach, 92663; (2) 305 Grand Canal, Newport Beach, 92662; (3) 506 W Oceanfront, Newport Beach, 92661; (4) 3803 Marcus Ave., Newport Beach, 92663; (5) 307 Goldenrod Ave., Newport Beach, 92625; (6) 1703 Plaza Del Sur, Newport Beach, 92661; (7) 2628 Ocean Blvd., Newport Beach, 92625; (8) 117 25th St., Newport Beach, 92663; and (9) 121 Emerald Ave., Newport Beach, 92662 (the "Existing Pacaso Homes"), must be allowed to nevertheless continue indefinitely because they lawfully existed in the City before the Ordinance came into effect. As explained herein, the Existing Pacaso Homes were "lawfully established prior to the effective date" of the Ordinance, and thus the Ordinance does not apply to them. *See* Ex. W to Ordinance 2023-4 (§ 20.48.220(A)).

88. In express acknowledgement of this, in connection with amending its time share ordinance, the City confirmed that Pacaso has a "good defense of nonconforming use," and that the Existing Pacaso Homes would be "grandfathered" and thus not subject to the Ordinance. *See infra* ¶¶ 66-67.

89. Namely, during the October 6, 2022 Planning Commission Special Meeting, City Attorney Harp relayed that the City could consider an amortization program for fractional ownership homes established before regulations are in place, thereby conceding that any attempt to regulate would be outside of the scope of the Ordinance: "[T]ypically when you deal with nonconforming uses you go through some type of amortization program after the fact if you want to go back and regulate them." (City of Newport Beach, Planning Commission Special Meeting: October 6, 2022, YouTube, at  46:04–46:32 (Oct. 6, 2022), https://youtu.be/A7tOJLrMRtg?t=2767.; Attach. No. PC 6 to April 20, 2023 Planning Commission Meeting, October 6, 2022, *Planning Commission Study Session Minutes*.)

90. Further, during the March 14, 2023 City Council Meeting, Community Development Director Jurjis stated that enforcement procedures are documented in the NBMC and the "twelve existing Pacaso properties would be grandfathered based on

24

1 the current direction of Council . . . ."  (City of Newport Beach, Newport Beach City
2 Council Meeting: March 14, 2023, YouTube, at 2:42:49–2:44:00 (Mar. 14, 2023),
3 https://youtu.be/NSFsgLitmcM?t=9769; Compiled Minutes, March 14, 2023 Meeting
4 Minutes, at 12-645.)

5      91.   Before the effective date of the Ordinance, Pacaso created a property-
6 specific LLC for each Existing Pacaso Home, which owned deeded title to the real
7 property.  Pacaso then organized and vetted co-owners, who purchased partial interests
8 in the property-specific LLC prior to the enactment of the Ordinance.  Prior to (and
9 continuing since) the enactment of the Ordinance, Pacaso homeowners have owned
10 and used their Existing Pacaso Home, including residing at the home, suggesting
11 improvements to the home, and enjoying the benefits of the home and broader Newport
12 Beach community.

13      92.   The Existing Pacaso Homes were in compliance with all laws, rules,
14 regulations, and ordinances, including the NBMC on the date that the Ordinance
15 became effective.  As explained above, the City's previous time share ordinance never
16 applied to Pacaso or the Existing Pacaso Homes and the City could not at any time
17 legally enforce its previous time share ordinance against Pacaso for the reasons
18 described above, and thus the Existing Pacaso Homes constitute a legal
19 "nonconforming use" that existed lawfully before the Ordinance became effective, just
20 as City Attorney Harp acknowledged.  *Id.*

21      93.   Because the City's previous time share ordinance never applied to Pacaso
22 and the City could not legally enforce it against Pacaso, the Existing Pacaso Homes
23 and the Pacaso homeowners at such Existing Pacaso Homes are exempt from the
24 application of the Ordinance.  Therefore, the nine Existing Pacaso Homes can continue
25 indefinitely.

26      94.   The homeowners—whose rights were, prior to the new Ordinance, well
27 recognized and have always been protected—are entitled to continue using their homes
28 as they did before the enactment of the Ordinance.

## VII. The City Intends To Enforce the Ordinance Against Pacaso and Pacaso Homeowners

95.     The Ordinance went into effect thirty days after its adoption, meaning that the Ordinance became effective on June 22, 2023.

96.     The City's conclusions in the May 9, 2023 Report confirm Defendants' intent to ban Pacaso under the Ordinance once it became effective on June 22, 2023. The City references Pacaso and its model in the Background section of its May 9, 2023 Report, stating that: "Fractional homeownership is when multiple owners (usually 4-8) equally share property ownership through a formal agreement, often managed by a private company or are self-organized.  Each owner's time at the property depends on their share, such as 45 days for a 1/8 share, typically spent in one- or two-week increments."  (May 9, 2023 Report at 2.)  The City goes on to state that its "Staff is aware of a total of 12 fractional ownership homes in the city," which is attached as Attachment C to the May 9, 2023 Report.  (*Id.*)  Attachment C to the May 9, 2023 Report, titled "Fractional Ownership Map," drops a pin on several Pacaso Homes in the City of Newport Beach, indicating the City's conclusion that these homes are "the 12 fractional ownership homes in the City." (Ex. C to May 9, 2023 Report.)  Likewise, the City's commissioned Fractional Homeownership report conducted by Sagecrest for the City of Newport Beach Community Development Department lists several Pacaso homes in Newport Beach as "known or suspected . . . fractional ownership properties." (Ex. J to Attach.  A to May 9, 2023 Report, Sage Crest Planning + Environmental Report at 12-35—12-37.)  The City confirmed that its purpose in broadening the definition of time shares to include fractional ownership uses in the Ordinance was to thereby prohibit them in residential zoning districts.  (*See* May 9, 2023 Report at 2-3.)

97.     In addition, in its preamble, the Ordinance specifically mentions and attaches Pacaso's correspondence with the California Department of Real Estate regarding Pacaso's model and time share uses.  (*See* Attach.  A to May 9, 2023 Report, Ordinance No. 2023-4: Adopting Code Amendment, at 2.)  The Ordinance further

26

mentions, in its preamble, that an Ad-Hoc Committee discussed the potential regulatory scheme with representatives of Pacaso, and that during this process, Pacaso proposed an ordinance regulating Pacaso-managed homes.  (*See id.* at 12-12; *see also* May 9, 2023 Report at 3.)  However, the Ordinance, in its preamble, confirms that following these discussions with Pacaso and about Pacaso's proposed ordinance, the Ad-Hoc Committee nevertheless "presented their finding to the Planning Commission" recommending that the City Council "broaden the definition of time shares to include fractional ownership uses," such as Pacaso's.  (Attach.  A to May 9, 2023 Report, Ordinance No. 2023-4: Adopting Code Amendment, at 12-12).

98.    Pacaso and its homeowners faced, and continue to face, significant damage and harm–including a violation of their rights–as of the date the Ordinance went into effect on June 22, 2023, and continuing to this date.  These consequences include fines, misdemeanors or imprisonment.

99.    Violations of the Ordinance carry with it enormous penalties, including a misdemeanor punishable by a fine of up to $1,000 per day, or by imprisonment up to six months, or by both such fine and imprisonment.  *See* NBMC § 1.04.010(C).  Likewise, violations of the Ordinance also carry with it civil actions punishable by civil penalties up to $1,000 per violation for each day the violation is found to exist.  *See* NBMC § 1.04.010(D).

100.    Further, "[a] separate offense shall be deemed to have been committed whenever: (a) a person repeats the act that constitutes the violation, or (b) any condition or circumstance that constitutes a violation is allowed to exist for more than twenty-four (24) hours," making the remedies under the Ordinance cumulative.  NBMC § 1.04.010.  There is no cap to the number of violations a person or entity can accumulate under the ordinance—it is an indefinite, cumulative penalty.  Put another way, if a Pacaso homeowner lives in their own home for a week, under the Ordinance, that one homeowner staying in their own home for one week could face up to 3.5 years imprisonment and $7,000 in fines.

101.   In addition to such penalties, Section 1.04.020 declares any code violations to be deemed a "public nuisance" that "may be summarily abated as such by this City."  NBMC § 1.04.020.

102.   Accordingly, once the Ordinance is effective, each day that Pacaso manages one of its nine homes, Newport Beach exposes Pacaso to massive daily fines of up to $9,000 and the threat of imprisonment, among other penalties.  Likewise, Pacaso homeowners face massive daily fines of up to $1,000 and the threat of imprisonment, among other penalties, for merely staying in or using the very home that they own.  Countless other citizens may face similar harm under the Ordinance if it is not stricken.

## VIII.  The Ordinance Is Vague and Ambiguous, And Thus Should Be Stricken

103.   The Ordinance fails for being vague and ambiguous on its face and as applied to Pacaso (if it even applies in the first instance).  The Ordinance fails to provide individuals and entities—including Pacaso, homeowners, real estate agents, brokers, and persons of ordinary intelligence, among others—a reasonable opportunity to know what conduct, speech, or uses are prohibited, or any guidance as to how to determine whether their conduct, use of a home, or speech with regard to time share uses falls within the prohibited conduct.

104.   The May 9, 2023 Report states that a "time share use" is defined as "any arrangement, plan, scheme, or similar device' that limits the owner to the right for 'exclusive use of real property, or any portion thereof' for 'less than a full year during any given year, on a recurring basis for more than one year.'  This means the use of any real property in which an owner has exclusive use of said property for less than the full year would be classified as a time share."  (May 9, 2023 Report at 3.)

105.   However, the Ordinance provides no guidance or criteria as to how its vague definitions apply in many circumstances, such as when ordinary co-owners, who are not Pacaso clients, make arrangements concerning when or how they can use a jointly owned property.  The ordinance thus fails to provide people of ordinary

28

intelligence a reasonable opportunity to understand what conduct it prohibits, on the one hand, and authorizes, on the other, and as a result, encourages arbitrary and discriminatory enforcement.

106.    As one example, the City fails to define what "pursuant to a plan" means. As a result, it is unclear whether the Ordinance applies to a family that purchased and co-owns a house among cousins and who use a Google calendar allotting times in which certain family members will use the house.  Likewise, it is unclear whether the Ordinance prohibits siblings who buy and co-own a home together who have allotted times in which they can each enjoy using the home.  The Ordinance also potentially implicates friends who buy and share a home but who stagger the periods of the year that they use and enjoy that home, and bought the property with such an intention and plan.  Likewise, the Ordinance potentially prohibits domestic partners, or divorced or separated spouses, who bought a home together intending to alternate usage of a jointly owned home at different times of year for whatever personal reasons—none of which is the concern of the City.  Similarly, a family that habitually rents out their house for the summer months, but otherwise retains access rights for the remainder of the years going forward would be covered.  Under the plain language of the Ordinance, it appears that all of these scenarios would be prohibited, leaving ordinary citizens guessing as to what kind of arrangements are or aren't permissible under the Ordinance, with no clarity as to how to determine this.

107.    But the City has urged that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member."  Thus, it is entirely unclear what is or is not prohibited and how to interpret the Ordinance's definitions with regard to co-owners who have ***any*** arrangements as to when or how to use the property, leaving citizens guessing as to how to comport their conduct to comply with the ordinance.

COMPLAINT                                                                 CASE NO. 8:23-cv-01762

108.  The City acknowledged this ambiguity and resulting confusion.  The May 9, 2023 Report summarized the Planning Commission's recommendation, which specifically pointed out the need to "clarify" whether time share definitions excluded "shared vacation homes by family or friends":

> On April 20, 2023, the Planning Commission held a public hearing to discuss draft Zoning Code and LCP amendments.  Seven people spoke (six in favor and one against).  The Planning Commission recommended approving the amendments and suggested two additional changes for the City Council's consideration: 1) prohibit advertising time shares for sale, and 2) ***clarify time share definitions to exclude shared vacation homes by family or friends so that it is clear what is not intended***.

(May 9, 2023 Report at 3 (emphasis added).)

109.  However, neither the May 9, 2023 Report, nor the definitions in the Ordinance, clarify this issue.  Instead, the May 9, 2023 Report merely states that, despite the confusion around whether shared vacation homes with family or friends would be prohibited under the Proposed Ordinance, the City would not change the proposed definition of a time share plan to clarify this:

> With respect to an exception to the definition of time share plan, Staff is recommending that the definition remain as proposed because the definition treats everyone equally and avoids creating a loophole that could be used to avoid regulation.  Specifically, the definition of time share plan set forth in the proposed ordinances requires several conditions be met to trigger regulation and ***does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member***.  These conditions include: (i) the use of an accommodation; (ii) pursuant to a plan; (iii) whereby a purchaser, in exchange for consideration;

1    and (iv) receives the right to exclusively use the accommodation

2    for less than one year during a given year, on a recurring basis for

3    more than one year. . . .

4  (*Id.* at 4 (emphasis added).)

5    110.    The definition and what it covers therefore remains confusing and unclear.

6  The definition of a "time share plan," sweeps in all co-ownership structures—no matter

7  whether they are owned by strangers or family members, either via direct purchase or

8  inheritance.  It is thus entirely unclear how to interpret the Ordinance and proposed

9  definition of a "time share plan" with regard to co-owners who have purchased a

10 property together with arrangements or a plan to determine when or how each co-owner

11 uses the property.  Residents are left to guess how to comport their conduct to comply

12 with the Ordinance.  On one hand, the City states that "the purchase of an entire

13 property between family and friends" is necessarily a "non-time share use," but in

14 direct odds with this statement, the City urges that the definition "treats everyone

15 equally." (*Id.* at 4.)

16    111.    The cloud of threatened criminal prosecution and massive fines for

17 violations of the Ordinance makes it even more troubling, since the vague ordinance

18 may trap innocent and honest citizens by not providing fair warning.

19    112.    Because the Ordinance is vague, ambiguous, and confusing, both on its

20 face and as applied to Pacaso, and threatens ordinary, law-abiding citizens with

21 enormous penalties for an ambiguous spectrum of conduct, it should be stricken.

22 **IX.    The Ordinance Exceeds The Scope Of Permissible Zoning Authority And Police Power, And Should Be Stricken On That Basis**

23

24    113.    The Ordinance, and the City's attempt to regulate Pacaso under the

25 Ordinance, is outside the scope of the City's authority to regulate permissible zoning

26 subject matters, and exceeds the scope of the City's zoning authority and police power.

27 *See* Cal. Const., art. XI, § 7; Cal. Gov't Code, § 65850.

28

COMPLAINT                                                    CASE NO. 8:23-cv-01762

114.  The Ordinance seeks to impermissibly regulate *who* the owners are, in contrast to the *use* of land as between residential and other purposes (which is permissible).  Because the Ordinance and the City's application of the Ordinance does not focus on the use of land, but rather targets certain individuals, it exceeds the scope of permissible zoning regulations.

115.  The City has already acknowledged the limits on its power in this regard, and conceded that its zoning ordinance cannot regulate the ownership of the property, and can only regulate use of the property.  As Community Development Director Seimone Jurjis conceded during the City Council Meeting:

> From a city standpoint the only thing we can regulate is the use of the property.  ***We can't regulate the ownership of the property***.  We don't regulate LLCs.  We don't regulate the trusts, or the S Corps, or tenants in common, or joint tenancy.  We don't regulate that.  ***The only thing we can regulate that is given to us as authority from the state is how do you use the property***.

(City of Newport Beach, Newport Beach City Council Meeting: November 16, 2021, YouTube, at 43:40–44:13 (Nov. 17, 2021) (emphasis added), https://youtu.be/nk1QT25nAUQ?t=2620.)

116.  Instead of focusing on the "use" of property, the Ordinance, by its terms, and the City, in their application against Pacaso and its homeowners—but not families or friends—regulates and targets individuals based on who the owners are, not how they use their property.  As the City even concedes, whether the homeowners are "family and friends" is determinative of whether the use is a time share or non-time share use.  (*See* May 9, 2023 Report at 4 (stating that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member").)  Further, the City concedes that the Ordinance "is not intended" to cover "shared vacation homes by family or friends."  (May 9, 2023 Report at 3.)  Thus, the

COMPLAINT                                                    CASE NO. 8:23-cv-01762

application of the Ordinance and impact on property ownership improperly turns on the *identities* of owners, which is impermissible.

117.   As a result, the Ordinance enables (and in fact requires) the City to impermissibly peer within co-owned homes into the relationships and manner of use of such co-owners.  The Ordinance regulates how people come together to own and enjoy property, requiring the City to assess and make determinations about intimately private engagements and arrangements, including those among friends, family members, co-workers, spouses, and separated or divorced spouses.  The ordinance also invades, interferes with, and restricts individuals' ability to make intimate personal decisions about their living arrangements.  What is more, the City purports to retain the ability to make a subjective determination about whether those intimate and personal living arrangements are "formal" or "informal."  This is not within the City's power or scope to regulate.

118.   A land use ordinance also exceeds municipal authority under the police power where it has no substantial relation to the public health, safety, morals or general welfare.  Defendants' enforcement of the time share ordinance against Pacaso is arbitrary and unreasonable, and has no substantial relation to the public health, safety, morals, or general welfare, let alone any of the other stated goals underlying the Ordinance, as propounded against Pacaso.

119.   In fact, the City itself conceded that the need to update its time share ordinance and its concern with fractional co-ownership structures like Pacaso's stemmed from unhappy citizens, but expressed doubt that the "law will be on the side of the City related to the interpretation of land use."  As noted in the Minutes of the City Council Meeting, Council Member Kleiman expressed the opinion that Pacaso is "a market disrupter creating a new business model that has not been previously seen or utilized" and noted allowable land uses, the City's purview, and discussed transient use.  (City of Newport Beach, Newport Beach City Council Meeting: March 14, 2023, YouTube,    at    1:22:32–1:22:57    (Mar.    14,    2023),

33

1  https://youtu.be/NSFsgLitmcM?t=4952.)  She elaborated, stating "I'm not confident
2  that the law will be on our side in the interpretation of land use here, but what I am
3  clear about from the many many many emails we received and from all of you here
4  tonight is the community's desire to disallow this type of use to the extent that we're
5  able."  (*Id.* at 1:23:47–1:24:14, https://youtu.be/NSFsgLitmcM?t=5027; March 14,
6  2023 City Council Meeting Minutes at 12-642.)

7        120.  However, this stated concern, among the others discussed above at
8  Paragraphs 75-85 (including increases in traffic, parking, noise and trash, commercial
9  or short-term uses of the homes, frequent turnover in the home, and impacts on the
10  City's housing supply and character of residential neighborhoods), do not constitute a
11  rational basis to apply a time share ordinance against Pacaso.  Given the many other
12  existing regulations and policies in place to address the supposed concerns the City has
13  with Pacaso's properties or other fractional co-ownership structures, any attempt to
14  apply the Ordinance against Pacaso is unreasonable, unwarranted, and an invalid
15  purported land use ordinance.

16        121.  Thus, the Ordinance and City's application of it against Pacaso, exceeds
17  the scope of the City's zoning authority and police power.

18  **X.**   **The Ordinance Violates Homeowners' Right Of Privacy And Should Also
       Be Stricken On That Basis**
19

20        122.  The Ordinance, and the City's attempt to regulate Pacaso and Pacaso
21  homeowners under it, is a violation of homeowners' rights to privacy, including a
22  violation of state constitutional rights of due process and equal protection by infringing
23  upon their fundamental right of privacy under article I, section 1, of the California
24  Constitution.  Article I, section 1 of the California Constitution provides: "All people
25  are by nature free and independent and have inalienable rights.  Among these are
26  enjoying and defending life and liberty, acquiring, possessing, and protecting property,
27  and pursuing and obtaining safety, happiness, and privacy."

28

34

123.   There is a recognized autonomy privacy interest in choosing the persons with whom a person will reside, and in excluding others from one's private residence. Pacaso homeowners have a privacy interest in coming together with co-owners to own and use a home together.  Likewise, Pacaso homeowners have a privacy interest in choosing with whom to live, in excluding others from their home, and in their private living arrangements.  Like all other homeowners, Pacaso homeowners have a reasonable expectation of privacy in their own home, including in their living arrangements, in how they can come together to own and enjoy property, in choosing with whom to live, and in excluding others from their home.  Pacaso homeowners further have a privacy interest in determining and establishing the rights and obligations that will govern each homeowner's property interest and use of the home.

124.   The Ordinance violates these privacy rights.  It regulates and invades how Pacaso homeowners can come together to own and enjoy property together, and restricts homeowners from being able to exclude others from their home.  The ordinance intrudes into, interferes with, and restricts individuals' ability to make intimate personal decisions about their living arrangements, including who they want to co-own property with, how they want to allocate the time spent within that home, how they can share a home with others, and their ability to exclude others from the home.  The Ordinance also regulates and invades intimate and private engagements and living arrangements, including assessing the identity of co-owners, relationships of co-owners, and manner of use of co-owners.  The Ordinance further violates co-owners' privacy rights by purporting to allow the City the right to evaluate the nature of any agreement entered into among homeowners to determine whether such arrangement is formal enough to trigger the Ordinance.

125.   The City even concedes that the ***identity*** of homeowners is relevant to the City's analysis as to whether the ordinance applies—stating that it "***does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family***

35

*member*." (May 9, 2023 Report at 12-4 (emphasis added).)  In doing so, the City impermissibly intrudes upon living arrangements.

126.   Given the City's regulation of the manner of use of co-owners based on relationships, intimate and private engagements and arrangements among friends, family members, co-workers, spouses, and separated or divorced spouses, coupled with the draconian fines and criminal penalties that a violation of the time share ordinance carries, the Ordinance is an invasion of homeowner's privacy rights.

## XI.   Defendants' Selective And Arbitrary Enforcement Of The Ordinance Against Pacaso Is Impermissible

127.   Defendants have deliberately and selectively singled out Pacaso.

128.   The City's plan to enforce the Ordinance against Pacaso, without any similar measures taken against other co-owned residences (through LLCs, trusts, a tenancy in common, or otherwise), is selective and arbitrary enforcement with discriminatory, disparate impact implications.

129.   Several joint or partial ownership scenarios appear to fall under the City's broad definition of a "time share plan" under the Ordinance, but will nevertheless still be permitted to operate undisturbed.  For example, a single-family residence co-owned by multiple family members through an LLC would purportedly fall under the City's Ordinance.  Or, as another example, a residence co-owned by a husband and wife through an LLC would purportedly fall within the time share ban.  Yet the City has expressly indicated that they will not be attempting enforcement against such entities or individuals who are similarly situated and functionally the same as Pacaso's homeowners.

130.   For example, the City has expressly stated that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member." (May 9, 2023 Report at 12-4.)  As another example, the City specifically stated that the

COMPLAINT                                                           CASE NO. 8:23-cv-01762

Ordinance "is not intended" to cover "shared vacation homes by family or friends."
(May 9, 2023 Report at 12-3.)

131.   As the City's own council members pointed out, co-ownership of real property is common in Newport Beach and exists today in a variety of forms.  As Community Development Director Seimone Jurjis noted during the City's November 16, 2021 City Council Meeting, co-ownership is "not a new concept" and people have long participated in fractional ownership of other real property such as larger buildings such as apartments or commercial properties.  (City of Newport Beach, *Newport Beach City Council Meeting: November 16, 2021,* YouTube, at 38:39–39:25 (Nov. 17, 2021), https://youtu.be/nk1QT25nAUQ?t=2319.)

132.   Mr. Jurjis noted that 56% of all single-family homes in Newport Beach are owned in an LLC or trust.  (*Id.* at 41:19–41:28.)  Further, Mr. Jurjis noted that the City only has access to the name of the LLC or trust—the City "[does not] know anything about who owns the LLC, what [is] the partnership structure of the LLC, who are the trustees."  (*Id.* at 41:28–41:53.)

133.   Mayor Blom highlighted this issue during the November 16, 2021 City Council Meeting:

> The one thing that jumped out the most is that a lot of ownership in Newport Beach is held in LLCs and trusts, and there's a portion of residents here that have multiple homes within the City and some of those might be held in different entities, and if we start getting into the definition of not allowing fractional ownership[,] it frightens me because all of a sudden we're in an LLC and trust issue where that can be litigated in a way that might not be beneficial to a huge amount of our residents that are maybe giving ownership of that Balboa cottage to their four children, or something where maybe an operating agreement has the benefit of family in mind as well as the benefit of financial well-being.

(*Id.* at 51:31–52:40)

134.   Mayor Blom further stated: "I have a hard time denying **when 56% of the ownership of Newport Beach is in an LLC or trust how we can legally justify getting rid of fractional ownership in any way, shape or form** because it would eventually roll back to all of those kinds of arguments."  (*Id*. at 55:40–55:57 (emphasis added).) The City opaquely memorialized this concern in the minutes for this meeting, stating that "Council Member Blom highlighted the percentage of LLCs and trust ownerships in Newport Beach and discussed the reality of future homeownership and impact to the City with the elimination of fractional ownership." (City of Newport Beach, City Council Meeting Minutes, vol. 65 at 183 (November 16, 2021).)

135.   As then-Mayor Pro Term Kevin Muldoon noted, each member in a Pacaso co-ownership arrangement is essentially "a more stringent partner than a family-owned trust or an LLC"—an attempt at a distinction that has no legal or substantive significance.  (City of Newport Beach, *Newport Beach City Council Meeting: November 16, 2021*, *supra*, at 1:10:15–1:11:14.)

136.   The fact that the City plans to enforce the Ordinance against Pacaso, where other similarly situated properties with similar ownership structures will expressly not be targeted, is clear evidence that the City plans to selectively enforce the ordinance and that the City is deliberately and wrongly singling out Pacaso.

137.   The City's enactment of the Ordinance and plan to enforce against Pacaso, where other co-owned residences (through LLCs, trusts, or otherwise) do not face similar challenges, is selective and arbitrary, and based on invidious criteria, including pleasing vocal Newport Beach residents with improper bias against outsiders.

## XII.   **The Ordinance Conflicts with Coastal Act Policies**

138.   The Ordinance does not qualify as a *de minimis* Local Coastal Program ("LCP") amendment because it would fundamentally alter an allowable use of real property.  An LCP amendment may be considered *de minimis* only under extremely narrow circumstances and must "not propose . . . any change in the allowable use of property." Cal. Pub. Res. Code § 30514(d)(1)(B) (2023).  Here, the Ordinance would

treat co-ownership of residential units in the City as "time share uses" that are
prohibited in all residential zones—including those in the Coastal Zone.  As such, the
Ordinance would apply a host of new regulations to any co-owned properties.  Because
56% of all single-family homes in Newport Beach are owned as LLCs or in trust—
structures that allow multiple owners of a property—the City's Ordinance could alter
the use of over half of the City's single-family homes.  Such sweeping and broad
reaching regulation falls well outside of what the Coastal Act considers to be *de
minimis*.

139.  More specifically, before its amendment, the NBMC defined "time share
use" as a "right of occupancy . . . that is **not** coupled with an estate in the real property."
NBMC § 21.70.020.V (emphasis added).  Accordingly, homes with multiple owners,
such as in an LLC or trust, are not considered time shares because each owner holds
an ownership interest in the home.  The Ordinance, however, would broaden "time
share uses" to include co-owned homes that are used separately by multiple owners
"***regardless of whether*** [the] rights of use are a result of a grant of ownership rights."
(*See* Ex. W to Ordinance 2023-4. (emphasis added).)  Under this broadened definition,
existing co-owned homes in the City's residential coastal zoning districts could be
considered prohibited time shares—fundamentally changing the use of those
properties.  *See* NBMC § 21.18 (not permitting time share uses in residential coastal
zoning districts).  Because the Ordinance would impose a novel restriction upon a
previously "allowable use of property" in the Coastal Zone, the amendment cannot be
considered *de minimis*.  Cal. Pub. Res. Code § 30514(d)(1)(B).

140.  In addition, the Ordinance conflicts with several Coastal Act Chapter 3
policies and therefore neither qualifies as *de minimis* nor meets the findings required
for an LCP amendment.  *See* Cal. Pub. Res. Code, §§ 30512(c), 30514(d)(1)(B).  As
an initial matter, no LCP amendment can be considered *de minimis* if it is not
"consistent with the policies of Chapter 3" of the Coastal Act.  Co-ownership
opportunities advance a number of Chapter 3 policies such that a prohibition of this

39

use would create inconsistencies with Chapter 3. For example, co-ownership augments the stock of overnight accommodations in the Coastal Zone for individuals who are not fortunate enough to live in coastal cities on a full time basis. By providing an additional option for accommodations and property ownership in the Coastal Zone, co-ownership homes increase coastal access overall. *See id.*, § 30210; Cal. Coastal Commission, Staff Report for City of Malibu LCP Amendment No. LCP-4-MAL-20-0083-2, (July 21, 2022), p. 2 (recognizing that increased supply in any one coastal accommodation type can "augment the stock of [all] overnight accommodations" and thereby enhance public access overall).

141. Further, by providing homeownership opportunities for some individuals and families in the Coastal Zone, co-ownership units remove those same individuals and families from competing for properties in the vacation rental market, thereby increasing rental stock and lowering demand and costs for others. Accordingly, co-ownership facilitates increased coastal access and recreational opportunities for all visitors, including lower cost visitor serving uses. *See* Cal. Pub. Res. Code, §§ 30210, 30213. Moreover, by providing ownership opportunities to multiple individuals and families in a single vacation property, co-ownership may help keep those seeking second homes in the Coastal Zone from purchasing lower-cost properties by themselves, thereby helping to maintain local housing stock for fulltime residents. Finally, co-homeownership increases property utilization and support for coastal businesses from multiple owners, unlike other second homes in the Coastal Zone that are more likely to sit empty much of the time. Accordingly, co-ownership uses help support visitor and recreational uses in the Coastal Zone in furtherance of multiple Chapter 3 policies. *See id.*, § 30213.

142. For each of the reasons set forth above, the Ordinance's restrictions upon co-ownership, which if imposed may increase vacation rental demand and the acquisition of lower-cost homes in the Coastal Zone as second homes, and result in reduced support of visitor and recreational uses by fractional homeowners, are at odds

40

with the Coastal Act's Chapter 3 policies. Accordingly, the Ordinance also fails to satisfy the Coastal Commission's finding requirements for an LCP amendment processed through the Commission's standard LCP amendment procedures. *See* Cal. Pub. Res. Code, §§ 30514(b), 30512(c).

143.    Because the Ordinance cannot satisfy the Coastal Act's requirements for an LCP amendment—much less a *de minimis* amendment—the Ordinance should be stricken.

## CLAIM 1

**DECLARATORY RELIEF: EXEMPTION FROM THE ORDINANCE UNDER SECTION 20.48.1220, CALIFORNIA CONSTITUTION, THE CALIFORNIA GOVERNMENT CODE, AND COMMON LAW**

144.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-143 as if fully set forth herein.

145.    Zoning ordinances have been held invalid and unreasonable as applied to particular property where the zoning ordinance attempts to exclude and prohibit existing and established uses that are not nuisances.

146.    There is an actual controversy now existing between Plaintiff and the City concerning the application of the Ordinance against Pacaso and the Existing Pacaso Homeowners concerning Plaintiff's exemption from the application of the Ordinance under section 20.48.1120 of the NBMC, California Constitution, and common law.

147.    The City has indicated its ability and intention to enforce the ordinance against Pacaso and the Pacaso homeowners at such Existing Pacaso Homes. *See supra* ¶¶ 95-102.

148.    Pacaso and Pacaso homeowners purchased the Pacaso homes with an understanding that the City's previous time share ordinance permitted their use in the home and set their expectations for its continued legality.

149.    The City's previous time share ordinance at section 20.48.220, titled "Time Share Facilities," "provide[d] regulations for time share developments," which was intended to regulate massive, resort-type commercial developments of more than

41

100 units with recreational amenities, rather than a single-family residence shared among 8 or fewer individuals. NBMC § 20.48.220. This previous ordinance clearly never applied to Pacaso or Pacaso homeowners.

150. The code section laid out a requirement for "Minimum Number of Units" of a time share facility, stating: "Each time share project shall have a minimum of one hundred (100) time share units. Time share projects consisting of less than one hundred (100) units, but developed or converted in conjunction with a resort hotel complex of three hundred (300) or more units, shall be considered to be in compliance with this requirement." NBMC 20.48.220(A)(3). In contrast, a Pacaso home is a single-family residence shared among 8 or fewer individuals, not a project including more than 100 units or in conjunction with a resort hotel complex.

151. The code section also laid out a requirement for "Required Amenities," stating: "Time share projects shall be developed with substantial recreational amenities (e.g., golf courses, tennis courts, swimming pools, etc.)." NBMC § 20.48.220(B) In contrast, a Pacaso home is merely a single-family residence with no recreational amenities.

152. And Pacaso's small co-ownership model is starkly different from any "time share developments" purportedly covered by the City's previous time share ordinance or that is properly the subject of *any* zoning regulation. *See supra* at ¶¶ 41-50.

153. Further, there was no reference in the previous time share ordinance or its definitions to fractional or partial co-ownership structures like Pacaso's, and thus it could not have been lawfully applied against Pacaso or Pacaso homeowners.

154. In fact, the Chapter of the NBMC governing the Local Coastal Program Implemental Plan defines "time share use" as a "a license or contractual or membership right of occupancy in a time share project that is ***not*** coupled with an estate in the real property." NBMC § 21.70.020.V (emphasis added). Accordingly, homes with multiple owners, such as in an LLC or trust, were not considered time shares under the

42

previous time share ordinance because each owner holds an ownership interest in the home.

155.   It is thus clear that Pacaso's properties did not fall within the purview of the City's previous time share ordinance, which on its face did not apply to real property co-ownership structures like Pacaso's, but rather, large commercial time share developments.

156.   The City never attempted to regulate Pacaso or its homeowners under the City's previous time share ordinance.

157.   The new Ordinance specifically states that it "shall not apply to any time share use that was lawfully established prior to the effective date" of the Ordinance. *See* Section 20.48.1220(A).

158.   Accordingly, the Existing Pacaso Homes must be allowed to continue indefinitely because they lawfully existed in the City before the Ordinance came into effect.  As explained above in Paragraphs 86-94, the Existing Pacaso Homes were "lawfully established prior to the effective date" of the Ordinance, and thus the Ordinance does not apply to them.  *See* Section 20.48.220.  The City has even acknowledged this. *See supra* at ¶¶ 88-90.

159.   Prior to (and continuing since) the enactment of the Ordinance, Pacaso homeowners have owned and used their Pacaso home, including residing at the home, suggesting improvements to the home, enjoying the benefits of the home, and experience and contributing to the broader Newport Beach community.  Pacaso homeowners have continued this ownership and use of their home since the enactment of the Ordinance.  There has never been an abandonment or interruption of the Pacaso homeowners' use of the Existing Pacaso Homes.

160.   The Existing Pacaso Homes were in compliance with all laws, rules, regulations, and ordinances, including the NBMC, on the date that the Ordinance became effective.  As explained above, the City's previous time share ordinance never applied to Pacaso or the Existing Pacaso Homes and the City could not at any time

43

legally enforce its previous time share ordinance against Pacaso for the reasons described above, and thus the Existing Pacaso Homes constitute a legal "nonconforming use" that existed lawfully before the Ordinance became effective, just as City Attorney Harp acknowledged. *Id.*

161.   Because, prior to the Ordinance, the City's previous time share ordinance never applied to Pacaso and the City could not legally enforce it against Pacaso, the Existing Pacaso Homes and the Pacaso homeowners at such Existing Pacaso Home are exempt from the application of the Ordinance as a "lawfully established prior to the effective date" of the Ordinance and can continue indefinitely.   *See* Section 20.48.1220(A).

162.   In addition, under common law and the California Constitution, Pacaso and the homeowners of the Existing Pacaso Homes have a vested property right in the use of their property of which they cannot not be constitutionally deprived without due process of law.  The Ordinance purports to take from Pacaso and the homeowners who co-own the Existing Pacaso Homes a valuable property right inherent in the ownership of such property.

163.   The Existing Homes and homeowners who resided in such homes have, at all times, been (and continue to be) lawful and in compliance with property and nuisance principles.  The Existing Pacaso Homes and the homeowners' use of such homes have never impaired the public health, safety, morals or general welfare, and have never constituted a public nuisance.  Nothing about the continuing use of the Existing Pacaso Homes would constitute a nuisance or ever did constitute a nuisance. Pacaso homes have, at all times, been (and continue to be) subject to all of the same noise and nuisance ordinances that apply to other single-family residences in Newport Beach, and have never been found to be a nuisance.

164.   Plaintiffs seeks declaratory judgment and a permanent injunction barring enforcement of the Ordinance against Pacaso, the Existing Pacaso Homes, and the

1  Pacaso homeowners at such Existing Pacaso Homes, as Pacaso, those homes, and
2  homeowners were acting lawfully prior to the Ordinance going into effect.

3                                   **CLAIM 2**

4        **DECLARATORY RELIEF: INAPPLICABILITY OF THE ORDINANCE**

5        165.   Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-164
6  as if fully set forth herein.

7        166.   There is an actual controversy now existing between Plaintiff and the City
8  concerning the application of the Ordinance against Pacaso and its homeowners,
9  including the Pacaso Homeowners that own Existing Pacaso Homes.

10       167.   The Ordinance was proposed and enacted to regulate Pacaso homes,
11 among other fractional co-ownership structures.  *See supra* at ¶¶ 95-102.  The City's
12 conclusions in the May 9, 2023 Report, along with its attached exhibits, as well as the
13 preamble of the Ordinance, confirm the City's intent to ban Pacaso under the
14 Ordinance.  *See supra* at ¶¶ 96-97.

15       168.   However, the Ordinance does not apply to Pacaso and its homeowners.
16 Section 20.48.220(A) provides that "[n]o time share use or time share unit shall be
17 established or permitted in any zoning district except as authorized in the Code."  The
18 Ordinance defines a "time share use" as "the use of one or more time share
19 accommodations or any part thereof, as a time share property."  Section 20.70.020.V.
20 A "time share property," is defined as "one or more time share accommodations subject
21 to the same time share instrument, together with any other property or rights to property
22 appurtenant to those time share accommodations."  *Id*.  A "time share instrument," in
23 turn, means "one or more documents, by whatever name denominated, creating a time
24 share plan or governing the operation of a time share plan, and includes the declaration
25 dedicating time share accommodations to the time share plan."  *Id*.  In turn, a "time
26 share plan" is defined as "any arrangement, plan, scheme, or similar device . . . whereby
27 a purchaser, in exchange for consideration, receives the right to exclusive use of real
28 property, or any portion thereof, whether through the granting of ownership rights,

45

possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years." *Id.* Taking these definitions together, the May 9, 2023 Report states that a "'time share use' is defined as 'any arrangement, plan, scheme, or similar device' that limits the owner to the right for 'exclusive use of real property, or any portion thereof' for 'less than a full year during any given year, on a recurring basis for more than one year.' This means the use of any real property in which an owner has exclusive use of said property for less than the full year would be classified as a time share." (May 9, 2023 Report at 12-3.)

169.    However, Pacaso homeowners and their use of their Pacaso home do not fall within any of these definitions. Under the relevant agreements governing Pacaso homeowners, a Pacaso homeowner does not, "in exchange for consideration, receive the right to exclusive use of [a Pacaso home], whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years"—as set out in the Ordinance. Rather, Pacaso homeowners' ability to spend time in their home is fluid, flexible and uncapped. Because Pacaso homeowners are not granted "the right to exclusive use" of a property under their agreements with Pacaso, the Ordinance does not apply. *Id.*

170.    Further, Pacaso's small co-ownership model is starkly different from any "time share use," "plan," "instrument" or "property" purportedly covered by the Ordinance, and thus does not apply to Pacaso. *See also supra* ¶¶ 41–50. Pacaso homeowners do not merely own the "right to exclusive use of real property, or any portion thereof . . . for a period of time less than a full year during any given year, on a recurring basis for more than one year" Section 20.70.020 (definition of "Time share plan" in Ordinance 2023-4), or "recurring rights of exclusive use to the real property, or portion thereof" *id.* Instead, Pacaso homeowners are actually true owners with complete control of their home and expansive rights, who own a real property asset in

a single-family home that includes real property interests, and rights and obligations shared among co-owners. Such real property rights include the right to possession, to control, to use and quiet enjoyment, to privacy and to exclude others, to sell the property, to physically be on the property, to leave the property, to choose who else can be on the property, to build or alter the property, to make improvements or refurbish the property, and to sell or dispose of the property, among many other rights.

171. Indeed, Pacaso homeowners have inherent and inalienable rights inherent to owning property, which include the right to possession, to control, to use and quiet enjoyment, to privacy and to exclude others, to sell the property, to physically be on the property, to leave the property, to choose who else can be on the property, to build or alter the property, to make improvements or refurbish the property, and to sell or dispose of the property, among many other rights. *See supra* ¶¶ 43-44. For example, Pacaso homeowners store their personal possessions on the property year round, are heavily involved in all levels of management and decision-making regarding the property, and vote on matters such as selecting and replacing the program manager, renovations on the home or other changes to the interior or exterior design, and various other fundamental homeownership matters. Pacaso homeowners can also sell the home outright, and choose to not work with Pacaso if they wish. Ultimately, Pacaso homeowners have complete control. These real property interests, rights and obligations of possession, control, exclusion, and disposition are distinct from and different than the "right to exclusive use" of a home as set out in the Ordinance.

172. Further, the City's stated goals and purpose, and Statement of Facts, underlying the Ordinance further confirms that the Ordinance does not apply to Pacaso and its homeowners, and that enforcement against Pacaso and its homeowners would do nothing to further the City's goals.

173. Targeting Pacaso does nothing to alleviate any concerns about "frequent turnover of the properties' occupants and its commercial management" allegedly resulting from "the residence [being] divided into eight shares with stays ranging from

47

two to fourteen nights in duration." (Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 12-9.) *See also supra* ¶¶ 82-83. The City lacks all visibility and control into how much time homeowners intend to spend in their homes, the frequency to which a homeowner invites over guests, how many overnight visitors the homeowner has, and how frequently they have people coming in and out their home (including landscapers, professional cleaners, etc.). Preventing Pacaso from buying properties has no bearing on the likelihood that other prospective buyers are buying the home as a second home, using it the same manner as the Pacaso homeowners, or anticipating using it for short-term lodging.

174. Prohibiting Pacaso also does nothing to increase "the housing supply" in Newport Beach or advance the City's goal of "meet[ing] housing demand." (Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 12-9; Attach E to May 9, 2023 Report, Planning Commission Resolution No. PC2023-018, at 12-548.) *See also supra* ¶¶ 80-81. Rather, Pacaso helps relieve competition for more affordable homes by giving second home buyers a better option. Instead of competing for a whole home valued at $525,000, for example, Pacaso offers up to eight second home buyers an option to be co-owners of a $4–9 million property for the same price. Just one Pacaso home can remove up to eight buyers from local competition.

175. Nor does regulating Pacaso advance the City's stated purpose of addressing concerns related to the alleged "commercialization of residential neighborhoods," (May 9, 2023 Report at 12-2) "change[s] to the fabric of the community due to the short-term nature of the stays," (Attach. B to May 9, 2023 Report, Ordinance No. 2023-5 at 12-307) and impacts caused by "fractionally owned homes [that] operate much like short-term lodgings," (*id.* at 12-308) which allegedly lead to "increases in traffic, parking, noise and trash" in residential neighborhoods. (May 9, 2023 Report at 12-2). *See also supra* ¶¶ 75-79. Pacaso is a purely residential co-homeownership structure that lacks any resemblance to such "commercial," or "short-term" uses. Short-term rentals are strictly prohibited in Pacaso homes. In fact,

Pacaso homeowners—by virtue of the policies they adopt when becoming a Pacaso homeowner (such as Pacaso home policies and good neighbor code of conduct policies)—likely cause less traffic, parking on the city streets, or noise than other Newport Beach residents.  For example, Pacaso co-owners agree not to have large events or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy, which commences one hour earlier than Newport Beach's reduction of daytime allowable exterior and interior noise levels (*see* NBMC §§ 10.26.025.030); co-owners agree not to rent the home to third parties; and Pacaso encourages homeowners to avoid parking on the street unless absolutely necessary.  Homeowners are true homeowners who make a significant financial investment in their home—and they are in it for the long haul.  They are directly invested in the home and its surrounding neighborhood and community, and own for their personal use and enjoyment, not for profit.  Just like their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a "short-term" vacation mentality, to their use of the property.  As discussed above, City Council Members have even acknowledged this. *See supra* ¶ 78.  Further, second homes are notorious for sitting empty much of the year.   In contrast, Pacaso homes are fully utilized, which means that Pacaso homeowners engage in their community and support local businesses year-round.

176.   Because the Ordinance does not apply to Pacaso, the City cannot enforce it against Pacaso and its homeowners.  Pacaso seeks declaratory judgment and a permanent injunction barring enforcement of the Ordinance against Pacaso or homeowners using Pacaso homes.

## **CLAIM 3**

## **SELECTIVE AND DISCRIMINATORY ENFORCEMENT**

177.   Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-176 as if fully set forth herein.

178.   The City's plan to enforce the Ordinance against Pacaso, without any similar measures taken against other co-owned residences (through LLCs, trusts, a

49

tenancy in common, or otherwise), intentionally and arbitrarily discriminates against Plaintiff in violation of the Fourteenth Amendment to the United States Constitution and Article I, section 7, of the California Constitution.

179.   Pacaso was and is treated differently from entities or persons similarly situated.   Several joint or partial ownership scenarios fall under the City's broad definition of a "time share plan" under the Ordinance, but will nevertheless still be permitted to operate undisturbed.  For example, a single-family residence co-owned by multiple family members or friends through an LLC would purportedly fall under the City's Ordinance.  For instance, eight siblings or friends who co-own a vacation house in the City through an LLC, and use a Google spreadsheet to reserve times in which each sibling intends to exclusively use the house throughout the year, and each person never stays for more than 14 consecutive days in one stay, and each person stays for at least 30 days but never stays for more than 45 days annually, would purportedly fall within the time share ban.

180.   Yet the City has expressly indicated that they will not be attempting enforcement against such entities or individuals who are similarly situated or functionally the same as Pacaso's homeowners, including co-ownership through LLCs or trusts among friends and family.  *See supra* ¶¶ 127-137.  For example, the City has expressly stated that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member." (May 9, 2023 Report at 4.)  The City also stated that the Ordinance "is not intended" to cover "shared vacation homes by family or friends."  (*Id.* at 3.)

181.   Further, as the City's own council members pointed out, co-ownership of real property is common in Newport Beach and exists today in a variety of forms.  As Community Development Director Seimone Jurjis noted during the City's November 16, 2021 City Council Meeting, co-ownership is "not a new concept" and people have long participated in fractional ownership of other real property such as

1  larger buildings such as apartments or commercial properties. (City of Newport Beach,

2  Newport Beach City Council Meeting: November 16, 2021, YouTube, at 38:39–39:25

3  (Nov. 17, 2021), https://youtu.be/nk1QT25nAUQ?t=2319.)

4    182.  Mr. Jurjis noted that 56% of all single-family homes in Newport Beach

5  are owned in an LLC or trust. (*Id*. at 41:19–41:28.) Further, Mr. Jurjis noted that the

6  City only has access to the name of the LLC or trust—the City "[does not] know

7  anything about who owns the LLC, what [is] the partnership structure of the LLC, who

8  are the trustees." (*Id*. at 41:28–41:53.)

9    183.  Mayor Blom highlighted this issue during the November 16, 2021 City

10  Council Meeting:

11    [T]he one thing that jumped out the most is that a lot of ownership in Newport

12    Beach is held in LLCs and trusts, and there's a portion of residents here that have

13    multiple homes within the City and some of those might be held in different

14    entities, and if we start getting into the definition of not allowing fractional

15    ownership[,] it frightens me because all of a sudden we're in an LLC and trust

16    issue where that can be litigated in a way that might not be beneficial to a huge

17    amount of our residents that are maybe giving ownership of that Balboa Island

18    cottage to their four children, or something where maybe an operating agreement

19    has the benefit of family in mind as well as the benefit of financial well-being.

20  (*Id*. at 51:31–52:40, https://youtu.be/nk1QT25nAUQ?t=3091.)

21    184.  Mayor Blom further stated: "I have a hard time denying ***when 56% of the***

22  ***ownership of Newport Beach is in an LLC or a trust how we can legally justify getting***

23  ***rid of fractional ownership in any way, shape or form*** because it would eventually

24  roll back to all of those kinds of arguments." (*Id*. at 55:40–55:57 (emphasis added).)

25    185.  As then-Mayor Pro Term Kevin Muldoon noted, each member in a Pacaso

26  co-ownership arrangement is essentially "a more stringent partner than a family-owned

27  trust or an LLC"—an attempt at a distinction that has no legal or substantive

28  significance. (*Id*. at 1:10:15–1:11:14.)

186.    Homes that are co-owned by families or friends through trusts or LLCs do not differ from how a Pacaso home is used by its co-owners. Yet, the City has stated that it will not pursue a similar enforcement agenda against them as it will against Pacaso.

187.    The fact that the City plans to enforce the Ordinance against Pacaso, where other similarly situated properties with similar ownership structures will expressly not be targeted, is clear evidence that the City plans to selectively enforce the ordinance and that the City is deliberately and wrongly singling out Pacaso.

188.    Further, the Ordinance and May 9, 2023 Report singles out and focuses on Pacaso. *See supra* ¶¶ 96-97. Likewise, discussion among City Council members and public comments concerning the enactment of the Ordinance during Planning Commission meetings, City Council meetings and public hearings revolved around banning Pacaso.

189.    Defendants' selective and unequal treatment of Pacaso (i.e., plans to enforce the Ordinance against Pacaso, where other co-owned residences, through LLCs, tenancy in common, or otherwise, will not face similar challenges) was intentional. Defendants have intentionally and deliberately singled out Pacaso on the basis of invidious criteria—namely, that Pacaso serves diverse individuals who, in the eyes of the City, are non-resident transients, and that vocal detractors in Newport Beach have strong feelings about Pacaso and want to ban and oust them from the City. The City's arbitrary and selective enforcement against Pacaso is a pretext to deny homeownership to new diverse residents who hope to purchase property in Newport Beach through a co-ownership structure, and for improper motive and discriminatory design of exclusion and actions designed to stifle diversity and housing opportunities for underrepresented communities.

190.    The City's unequal treatment of Pacaso is selective, arbitrary, and not rationally related to a legitimate governmental purpose. The City's goals, purposes and stated reasons underlying the passage of the Ordinance cannot pass muster. *See*

*supra* ¶¶ 74-85. Prohibiting Pacaso does nothing to alleviate any concerns about "frequent turnover of the properties' occupants and its commercial management" allegedly resulting from "the residence [being] owned in up to 1/8 shares with stays ranging from two to fourteen nights in duration." (Attach. E to May 9, 2023 Report, Planning Commission Resolution No. PC2023-018, at 1); *see also supra* ¶¶ 82-83. The City lacks all visibility and control into how much time homeowners intend to spend in their homes, the frequency to which a homeowner invites over guests, how many overnight visitors the homeowner has, and how frequently they have people coming in and out their home (including landscapers, professional cleaners, etc.). Preventing Pacaso from buying properties has no bearing on the likelihood that other prospective are buying the home as a second home, using it the same manner as the Pacaso homeowners, or anticipating using it for short-term lodging.

191. Prohibiting Pacaso also does nothing to increase "the housing supply" in Newport Beach or advance the City's goal of "meet[ing] housing demand." (Attach. E to May 9, 2023 Report, Planning Commission Resolution No. PC2023-018, at 2; Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 2-3); *see also supra* ¶¶ 80-81. Rather, Pacaso helps relieve competition for more affordable homes by giving second home buyers a better option. Instead of competing for a whole home valued at $525,000, for example, Pacaso offers up to eight second home buyers an option to be co-owners of a $4–9 million property for the same price. Just one Pacaso home can remove up to eight buyers from local competition.

192. Nor does regulating Pacaso advance the City's stated purpose of addressing concerns related to the alleged "commercialization of residential neighborhoods," "change[s] to the fabric of the community due to the short-term nature of the stays," and impacts caused by "fractionally owned homes [that] operate much like short-term lodgings," which allegedly lead to "increases in traffic, noise and trash" in residential neighborhoods. (Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 2, 3, 4); *see also supra* ¶¶ 75-79. Pacaso is a purely residential co-homeownership

53

structure that lacks any resemblance to such "commercial," or "short-term" uses. Short-term rentals are strictly prohibited in Pacaso homes.  In fact, Pacaso homeowners—by virtue of the policies they adopt when becoming a Pacaso homeowner (such as Pacaso home policies and good neighbor code of conduct policies)—likely cause less traffic, parking, or noise than other Newport Beach residents.  For example, Pacaso co-owners agree not to have large events or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy; co-owners agree not to rent the home to third parties; and Pacaso encourages homeowners to avoid parking on the street unless absolutely necessary.  Homeowners are true homeowners who make a significant financial investment in their home—and they are in it for the long haul.  They are directly invested in the home and its surrounding neighborhood and community, and own for their personal use and enjoyment, not for profit.  Just like their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a "short-term" vacation mentality, to their use of the property.  Further, second homes are notorious for sitting empty much of the year.  In contrast, Pacaso homes are fully utilized, which means that Pacaso homeowners engage in their community and support local businesses year-round.

193.  Given the many other existing regulations, such as noise control, nuisance, trash, and parking restrictions, in place to address the supposed concerns the City has stated with regard to Pacaso and other fractional co-ownership structures (other than those co-owned by family or friends), the City's enforcement agenda against Pacaso is suspect and nothing but a pretext to deny homeownership to new diverse residents.  Further, Pacaso co-owners agree to several additional restrictions that ensure their use promotes the City's stated goals, such as quiet hours, restrictions on parties or large events, restrictions on parking, and a short-term rental prohibition, among other things.  *See supra* ¶¶ 36, 76.  Pacaso homeowners are no different from other homeowners in Newport Beach, thus, efforts to preclude their homeownership

does nothing to advance the City's stated goals for enforcement against Pacaso (and not other residential co-ownership structures).

194.    The City of Newport Beach is a government entity acting pursuant to the Ordinance, which is an expressly adopted official policy that causes violations of the Fourteenth Amendment.  The City and its governing officials were, and are, acting under the color of law and authority in adopting and enforcing the Ordinance.  The threatened enforcement of the Ordinance against Pacaso is an action taken under the color of law.

195.    Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Pacaso seeks injunctive relief against the City, whose selective and discriminatory enforcement of the Ordinance against Pacaso and Pacaso homeowners conflicts with and violates the Fourteenth Amendment and California Constitution.

## CLAIM 4

## DECLARATORY RELIEF: INVALID USE OF MUNICIPAL AUTHORITY

196.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-195 as if fully set forth herein.

197.    The Ordinance is inapplicable against Plaintiffs for the separate and independent reason that it represents an invalid use of legislative authority, exceeds the scope of the City's zoning authority and police power, and is outside the scope of the City's authority to regulate permissible zoning subject matter under common law and the California Constitution.  *See* Cal. Const., art. XI, § 7; Cal. Gov't Code § 65850 *et seq*.

198.    In both Ordinances, the City acknowledges that it derives its authority to regulate land use under the police powers of the California Constitution and the California Government Code.  *See* Ordinance 2023-4 at 1 ("Article XI Section 7 of the California Constitution authorizes cities to make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws. . . .  California Government Code Section 65850 *et seq.* authorizes a city to adopt

ordinances that regulate land uses as a valid exercise of its police powers . . . ."); Ordinance 2023-5 at 1 (same); *see also* Cal. Const. art. XI, § 7; Cal. Gov't Code § 65850 *et seq.* The City expressly adopts the Government code by acknowledging its authority in paragraph two of each Ordinance, and yet the City's actions exceed the limits of this power. *See* Ordinance 2023-4 at 1; Ordinance 2023-5 at 1. The City has even acknowledged the limits on its power in this regard, and conceded that its zoning ordinance cannot regulate the ownership of the property, and can only regulate use of the property. *See supra* ¶ 115.

199. The City's adoption of the Ordinance, and its plan to enforce the Ordinance against Pacaso, impermissibly regulates *who* the owners are, in contrast to the *use* of land as between residential and other purposes (which is permissible). Because the Ordinance and the City's intended application of the Ordinance does not focus on the use of land, but rather targets certain individuals, it exceeds the scope of permissible zoning regulations.

200. Instead of focusing on the "use" of property, the Ordinance, by its terms, and the City, in their application against Pacaso and its homeowners—but not families or friends—regulates and targets individuals based on who the owners are, not how they use their property. As the City even concedes, whether the homeowners are "family and friends" is determinative of whether the use is a time share or non-time share use. (*See* May 9, 2023 Report at 4 (stating that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member").) The City also concedes that the Ordinance "is not intended" to cover "shared vacation homes by family or friends." (May 9, 2023 Report at 3.) Thus, the application of the Ordinance and impact on property ownership improperly turns on the *identities* of owners, which is impermissible.

201. As a result, the Ordinance enables (and in fact requires) the City to impermissibly peer within co-owned homes into the relationships and manner of use

of such co-owners.  The Ordinance regulates how people come together to own and enjoy property, requiring the City to assess and make determinations about intimately private engagements and arrangements, including those among friends, family members, co-workers, spouses, and separated or divorced spouses.  The ordinance also invades, interferes with, and restricts individuals' ability to make intimate personal decisions about their living arrangements.  This is not within the City's power or scope to regulate.

202.  The Ordinance is arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.  *See supra* ¶¶ 74-85; *see also* ¶¶ 118-121.  In fact, the City itself conceded that the need to update its time share ordinance and its concern with fractional co-ownership structures like Pacaso's stemmed from unhappy citizens and "community desires to disallow this use," but doubt that the "law will be on the side of the City related to the interpretation of land use."  *See supra* ¶ 119.  However, this stated concern is not a rational basis to apply the Ordinance against Pacaso.

203.  Further, prohibiting Pacaso does nothing to alleviate any concerns about "frequent turnover of the properties' occupants and its commercial management" allegedly resulting from "the residence [being] owned in up to 1/8 shares with stays ranging from two to fourteen nights in duration."  (Attach. E to May 9, 2023 Report, Planning Commission Resolution No. PC2023-018, at 1); *see also supra* ¶¶ 82-83.  The City lacks all visibility and control into how much time homeowners intend to spend in their homes, the frequency to which a homeowner invites over guests, how many overnight visitors the homeowner has, and how frequently they have people coming in and out their home (including landscapers, professional cleaners, etc.).  Preventing Pacaso from buying properties has no bearing on the likelihood that other prospective buyers are buying the home as a second home, using it in the same manner as the Pacaso homeowners, or anticipating using it for short-term lodging.

204.   Prohibiting Pacaso also does nothing to increase "the housing supply" in Newport Beach or advance the City's goal of "meet[ing] housing demand." (Attach. E to May 9, 2023 Report, Planning Commission Resolution No. PC2023-018, at 2; Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 2-3); *see also supra* ¶¶ 80-81.   Rather, Pacaso helps relieve competition for more affordable homes by giving second home buyers a better option.  Instead of competing for a whole home valued at $525,000, for example, Pacaso offers up to eight second home buyers an option to be co-owners of a $4–9 million property for the same price.  Just one Pacaso home can remove up to eight buyers from local competition.

205.   Nor does regulating Pacaso advance the City's stated purpose of addressing concerns related to the alleged "commercialization of residential neighborhoods," "change[s] to the fabric of the community due to the short-term nature of the stays," and impacts caused by "fractionally owned homes [that] operate much like short-term lodgings," which allegedly lead to "increases in traffic, parking, noise and trash" in residential neighborhoods. (Attach. A to May 9, 2023 Report, Ordinance No. 2023-4, at 2, 3, 4); *see also supra* ¶¶ 75-79.  Pacaso is a purely residential co-homeownership structure that lacks any resemblance to such "commercial," or "short-term" uses.  Short-term rentals are strictly prohibited in Pacaso homes.  In fact, Pacaso homeowners—by virtue of the policies they adopt when becoming a Pacaso homeowner (such as Pacaso home policies and good neighbor code of conduct policies)—likely cause less traffic, parking, or noise than other Newport Beach residents.  For example, Pacaso co-owners agree not to have large events or parties; co-owners adhere to a 9:00 p.m. to 7:00 a.m. quiet hour policy; co-owners agree not to rent the home to third parties; and Pacaso encourages homeowners to avoid parking on the street unless absolutely necessary.  Homeowners are true homeowners who make a significant financial investment in their home—and they are in it for the long haul.  They are directly invested in the home and its surrounding neighborhood and community, and own for their personal use and enjoyment, not for profit.  Just like

58

their neighbors, Pacaso homeowners make large financial investments in their homes and bring an owner mentality, not a "short-term" vacation mentality, to their use of the property. Further, second homes are notorious for sitting empty much of the year. In contrast, Pacaso homes are fully utilized, which means that Pacaso homeowners engage in their community and support local businesses year-round.

206. Given the many other existing regulations and policies in place to address the supposed concerns the City had with Pacaso's properties, the Ordinance, and any attempt to apply the Ordinance against Pacaso based on *ownership*, is unreasonable and unwarranted, and an invalid land use ordinance.

## CLAIM 5

### DECLARATORY RELIEF: THE ORDINANCE IS PREEMPTED

207. Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-206 as if fully set forth herein.

208. Article XI, Section 7, of the California Constitution states "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

209. The Ordinance is preempted by state law through express and implied field preemption and thus is invalid under the California Constitution.

210. Field preemption applies where local law regulates a particular area that the state has intended to occupy, or where the issue has been so completely covered by state law as to indicate that the issue is now exclusively a state concern, or where the issue has been only partially covered by state law, but the language of the state law indicates that the state interest will not tolerate additional local input.

211. The Ordinance fits squarely within the scope of the Vacation Ownership and Time-Share Act of 2004, Cal. Bus. & Prof. Code §§ 11210-11288 ("VOTA"), and regulates in the very field that the California legislature has reserved to itself and intended to fully occupy. A conflict exists between VOTA and the Ordinance because

COMPLAINT                                                                 CASE NO. 8:23-cv-01762

it addresses a subject that VOTA expressly and through necessary implication fully occupies, and because it contradicts the state law on a subject.

212.  Under VOTA, the California legislature has explicitly reserved the regulation of time share plans for the State, stating that "***the regulation of time-share plans and exchange programs is an exclusive power and function of the state***.  A unit of local government ***may not regulate time-share plans*** or exchange programs."  Cal. Bus. & Prof. Code § 11280(a) (emphasis added).  Subsection 11280(b) does not alter this regulatory framework.  The subsection merely confirms that VOTA does not invalidate zoning, subdivision, or building codes that do not "regulate time-share plans or exchange programs."  *Id.* § 11280(b).  For example, VOTA would not invalidate parking, noise, or building safety ordinances that would apply to a building subject to a time share plan.

213.  The California legislature could not be clearer in its intent that this is exclusively a state concern: "A unit of local government may not regulate time-share plans or exchange programs."  Cal. Bus. & Prof. Code § 11280(a).  This is exactly what the City seeks to do through the Ordinance.

214.  Further, the California legislature has clearly intended to regulate time shares broadly:

> In order to protect the quality of California time-share plans and the consumers who purchase them, it is the intent of the legislature that ***this chapter be interpreted broadly in order to encompass all forms of time-share plans with a duration of at least three years that are created with respect to accommodations that are located in the state*** or that are offered for sale in the state, including, but not limited to, condominiums, cooperatives, vacation clubs, and multisite vacation plans.

Cal. Bus. & Prof. Code § 11211(d) (emphasis added).

215.    The comprehensive nature of VOTA in regulating time shares and certain registration or advertising requirements for time share plans is so thorough and detailed as to manifest the legislature's intent to preclude local regulation of time shares and indicate that the issue is now exclusively a state concern.  VOTA's regulation of time shares as part of the state interest is what the Ordinance improperly regulates and prohibits.

216.    VOTA accordingly occupies the field of the regulation of time shares, thus preempting the Ordinance.

217.    Further, the Ordinance is preempted by VOTA because the City seeks to regulate the same thing (i.e., a "time-share plan"), but the Ordinance varies, conflicts with, and expands the definition used to regulate even more expansively than VOTA does.  A city cannot vary or change the definition of a time share to something different and more expansive than how the state defines a time share under VOTA.

218.    Under Cal. Bus. & Prof. Code § 11212(z), a "time-share plan" is defined to mean:

> any arrangement, plan, scheme, or similar device, other than an exchange program, whether by membership agreement, sale, lease, deed, license, right to use agreement, or by any other means, whereby a purchaser, in exchange for consideration, receives ownership rights in or the right to use accommodations for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years.  A time-share plan may be either of the following:

> (1) A "single site time-share plan," which is the right to use accommodations at a single time-share property.

> (2) A "multisite time-share plan," which includes either of the following:

> (A) A "specific time-share interest," that is the right to use accommodations at a specific time-share property, together

with use rights in accommodations at one or more other component sites created by or acquired through the time-share plan's reservation system.

(B) A "nonspecific time-share interest," that is the right to use accommodations at more than one component site created by or acquired through the time-share plan's reservation system, but including no specific right to use any particular accommodations.

219.    However, under the Ordinance, the definition of a "time-share plan" is modified, varied and expanded to mean:

any arrangement, plan, scheme, or similar device, whether by membership agreement, bylaws, shareholder agreement, partnership agreement, sale, lease, deed, license, right to use agreement, or by any other means, whereby a purchaser, in exchange for consideration, receives the right to exclusive use of real property, or any portion thereof, whether through the granting of ownership rights, possessory rights or otherwise, for a period of time less than a full year during any given year, on a recurring basis for more than one year, but not necessarily for consecutive years.  A time share plan shall be deemed to exist whenever such recurring rights of exclusive use to the real property, or portion thereof, are created, regardless of whether such exclusive rights of use are a result of a grant of ownership rights, possessory rights, membership rights, rights pursuant to contract, or ownership of a fractional interest or share in the real property, or portion thereof, and regardless of whether they are coupled with ownership of a real property interest such as freehold interest or an estate for years in the property subject to the time share plan.

NBMC § 20.48.220.

220.   Critically, Newport Beach attempts to define a time share plan more broadly, and conflicting with the state definition, to include arrangements where a purchaser receives, "the right to exclusive use *of real property, or any portion thereof*. . . ." *Id.*   Whereas VOTA defines a time share plan to cover arrangements where a purchaser receives "ownership rights in [accommodations] or the right to use *accommodations* . . . ."  Cal. Bus. & Prof. Code § 11212(z) (emphasis added).  This distinction has an important difference.  Accommodations is defined in VOTA to mean "any apartment, condominium or cooperative unit, cabin, lodge, hotel or motel room, or other private or commercial structure containing toilet facilities therein that is designed and available, pursuant to applicable law, for use and occupancy as a residence by one or more individuals, or any unit or berth on a commercial passenger ship, which is included in the offering of a time-share plan."  Cal. Bus. & Prof. Code § 11212(a).  Notably, single-family homes are not enumerated in the list of covered "structures."  Whereas, the City purports to expand the definition to *any* interest in *any real property*.

221.   Newport Beach also attempts to define a time share plan more broadly, and conflicting with the state definition, to include regulation of "an exchange program," whereas VOTA specifically excludes exchange programs from the definition of a time share plan.

222.   Further, Newport Beach sets out a broader definition of a "time share plan" by stating that it "shall be deemed to exist whenever such recurring rights of exclusive use to the real property, or portion thereof, are created, *regardless of whether such exclusive rights of use are a result of a grant of ownership rights, possessory rights, membership rights, rights pursuant to contract, or ownership of a fractional interest or share in the real property, or portion thereof, and regardless of whether they are coupled with ownership of a real property interest such as freehold interest or an estate for years in the property subject to the time share plan*," which VOTA's definition of a "time-share plan" does not include.

63

223.   In addition, the Ordinance is preempted by VOTA because the City seeks to regulate all time share plans in the City—regardless of the number of time share interests in a time share plan, or the period of time over which the use of a time share plan extends—which in turn varies and expands the scope and breadth of the time share plans that VOTA regulates.

224.   Namely, Cal. Bus. & Prof. Code §§ 11211.5(b)(1)-(3) provides that VOTA "does not apply to any of the following":

> (1) Time-share plans, whether or not an accommodation is located in this state, consisting of 10 or fewer time-share interests.  Use of an exchange program by owners of time-share interests to secure access to other accommodations shall not affect this exemption.

> (2) Time-share plans, whether or not an accommodation is located in this state, the use of which extends over any period of three years or less.

> (3) Time-share plans, whether or not an accommodation is located in this state, under which the prospective purchaser's total financial obligation will be equal to or less than three thousand dollars ($3,000) during the entire term of the time-share plan.

225.   However, the Ordinance carves out no such exceptions in its regulation of time share plans in the City, and instead covers all time share plans, including those that consist of 10 or fewer time share interests, and those for which the use extends over any period of three years or less.  The Ordinance is thus preempted because it conflicts with and varies the scope and breadth of regulation of time share plans in the City.

226.   The Ordinance further provides that time share uses are prohibited in all residential zoning districts, and are permitted in certain commercial and mixed-use zoning districts, provided that (among other regulations), the time share project has a minimum number of 100 units, unless the time share is part of a resort hotel complex that has 300 or more units.  NBMC § 20.48.220(B)(1)(b)).

COMPLAINT                                                              CASE NO. 8:23-cv-01762

227.   It is thus impossible to comply both with VOTA and the Ordinance. VOTA would permit an arrangement among eight owners for the "right to use accommodations" for a period of time less than a full year during any given year, whereas such use would be prohibited under the Ordinance, as it, *inter alia*, involves fewer than "100 units."

228.    Further, the Ordinance is preempted to the extent it requires that the City approve a sales plan, operating plan, management plan, and contingency plan in connection with any time share project that is approved.   NBMC § 20.48.220(B)(3). These requirements are both coextensive with, and contradictory to the state requirements under VOTA.  For example, VOTA mandates requirements in connection with communications to prospective purchasers and documents that must be disclosed to them, which are not required under the Ordinance. *See* Cal. Bus. & Prof. Code §§ 11226.1, 11245.   In addition, VOTA requires that any person who solicits prospective purchasers to purchase a time share interest, or who creates a time share plan with an accommodation in the state, must register the time share plan with the commissioner, unless the time share plan is otherwise exempt under this chapter, and that such registration must provide documentation that includes the developer's legal name, any assumed names used by the developer, principal office street address, mailing address, primary contact person, and telephone number, and a description of the inventory control system that will ensure compliance with Section 11250 of VOTA, among many other requirements. *See* Cal. Bus. & Prof. Code § 11226.  Although the Ordinance also has necessary registration requirements, the Ordinance, unlike VOTA, imposes different requirements, including that the City and the time share use operator enter into a development agreement together in compliance with Chapter 15.45, NBMC § 20.48.220(B)(3)(d), and that the applicant of a time share use must submit documents regarding a sales plan, an operating plan, a management plan, and a contingency plan, *id*. § 20.48.220(B)(3)(a).

229.   Unlike VOTA, the Ordinance requires documentation of a sales plan that addresses the times, areas and methods that will be used to sell the time share property. *Id*., § 20.48.220(B)(3)(a).   Among other requirements, the plan must include the location, length, and marketing methods that will be used, distinguishing on-site and off-site marketing and signage; and an estimate of the potential numbers of individuals and automobiles expected during various stages of the sales effort, as well as describe measures that will be implemented to reduce traffic during peak hours.   *Id*., § 20.48.220(B)(3)(a)(i).

230.   The Ordinance, unlike VOTA, also requires an operating plan that addresses the terms of the time share plan, the types of private unit and common amenities, and the general financing, maintenance, and management arrangements of the resort that benefit the unit owners.   *Id*., § 20.48.220(B)(3)(a)(ii).   Unlike VOTA, the Ordinance also requires a management plan that describes the methods employed by the applicant to guarantee the future adequacy, stability, and continuity of a satisfactory level of management and maintenance of a time share property.   *Id*., § 20.48.220(B)(3)(a)(iii).  And, unlike VOTA, the Ordinance requires a contingency plan that addresses the actions to be taken by the applicant if the time share project is an economic failure or fails to sell fifty percent of the time share intervals within two years of receiving a permit to occupy the first unit.   Thus, although both the Ordinance and VOTA seek to regulate the registration process of a time share and the required documentation for this, the Ordinance imposes broader and different requirements than the state imposes.

231.   Additionally, the comprehensive nature of VOTA and its regulation of the advertising of time shares precludes local regulation of the advertising of time shares. However, the Ordinance imposes penalties, including both the threat of imprisonment and monetary penalties, on any person who "[a]dvertise[s] or cause[s] to be printed, published, or disseminated in any way and through any medium, the availability for sale, in its entirety or a fraction thereof: (a) any property or unit in the City that is used

COMPLAINT                                                                CASE NO. 8:23-cv-01762

for a time share use or as a time share unit; or (b) any entity where the ownership thereof, in whole or in part, entitles the owner thereof to use a property or unit in the City for a time share use, if the responsible person receives or will receive an economic benefit from the sale." NBMC, § 20.48.220(A). The Ordinance is preempted by VOTA because the City seeks to regulate the advertising of time shares in a more expansive and different way than VOTA does. For example, VOTA prohibits any person from "[m]ak[ing] any material misrepresentation that is false or misleading in connection with any advertisement or promotion of a time-share plan," but unlike the Ordinance, does not flat-out ban all advertising of time shares by a person who receives or will receive an economic benefit from the sale. Cal. Bus. & Prof. Code § 11245(a)(1).

232. Further, the comprehensive nature of VOTA and its regulation of the management and development of time shares precludes local regulation of the management and development of time shares. The Ordinance imposes penalties, including both the threat of imprisonment and monetary penalties, on any person who "[d]evelop[s] or establish[s] a timeshare use in the City," and anyone who "[m]anage[s] a unit or property in the City that is being used for a time share use or as a time share unit." NBMC § 20.48.220(A). The Ordinance is preempted by VOTA because the City seeks to regulate the management and development of time shares in a way that varies the way that VOTA regulates time share developments and developers and managers of time shares.

233. Because the Ordinance duplicates, contradicts, and enters an area fully occupied by VOTA, it is preempted.

234. Plaintiffs seek a judgment declaring the ordinance invalid because it is preempted by state law.

COMPLAINT                                                                    CASE NO. 8:23-cv-01762

## CLAIM 6

### DUE PROCESS VIOLATION: THE ORDINANCE IS UNCONSTITUTIONALLY VAGUE AND AMBIGUOUS ON ITS FACE AND AS APPLIED TO PLAINTIFFS

235.    Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-234 as if fully set forth herein.

236.    The Ordinance violates the due process guarantees of the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the California Constitution because it is unconstitutionally vague and ambiguous on its face and as applied to Plaintiff.

237.    The Ordinance fails to provide individuals and entities—including Pacaso, homeowners, real estate agents, brokers, and persons of ordinary intelligence, among others—a reasonable opportunity to know what conduct or uses are prohibited, or any guidance as to how to determine whether their conduct or use of a home falls within the prohibited conduct.

238.    The May 9, 2023 Report states that a "time share plan would be added to mean "'any arrangement, plan, scheme, or similar device' that limits the owner to the right for 'exclusive use of real property, or any portion thereof' for 'less than a full year during any given year, on a recurring basis for more than one year.' This means the use of any real property in which an owner has exclusive use of said property for less than the full year would be classified as a time share." (May 9, 2023 Report at 3.)

239.    However, the Ordinance provides no guidance or criteria as to how its vague definitions apply in many circumstances, such as when ordinary co-owners, who are not Pacaso clients, make arrangements concerning when or how they can use a jointly owned property. The Ordinance thus fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, on the one hand, and authorizes, on the other, and as a result, encourages arbitrary and discriminatory enforcement.

240.    As one example, the City fails to define what "pursuant to a plan" means. As a result, it is unclear whether the Ordinance applies to a family that purchased and co-owns a house among cousins and who use a Google calendar allotting times in which certain family members will use the house. Likewise, it is unclear whether the Ordinance prohibits siblings who buy and co-own a home together who have allotted times in which they can each enjoy using the home. The Ordinance also potentially implicates friends who buy and share a home but who stagger the periods of the year that they use and enjoy that home, and bought the property with such an intention and plan. Likewise, the Ordinance potentially prohibits domestic partners, or divorced or separated spouses, who bought a home together intending to alternate usage of a jointly owned home at different times of year for whatever personal reasons—none of which is the concern of the City. The fact is that the Ordinance, by its plain language, fails to provide *any* clarity as to what set of facts will trigger a violation.

241.    The City's extra-textual comments prove the point. The City has urged that the Ordinance "does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member." (May 9, 2023 Report at 4.) For starters, it is unclear where in the Ordinance the City has found that atextual limitation. Further, even assuming such an atextual limitation can be grafted onto the Ordinance, it is unclear whether other atextual limitations exist and, if so, what the contours of those limitations are. Thus, it is entirely unclear what is or is not prohibited and how to interpret the Ordinance's definitions with regard to co-owners who have arrangements as to when or how to use the property, leaving citizens guessing as to how to comport their conduct to comply with the ordinance. The Ordinance thus fails to provide adequate notice and sufficient guidance, which would allow an individual to ascertain beyond mere speculation as to whether the use of their property constitutes a time share plan or use.

242.    The City acknowledged this ambiguity and resulting confusion. The May 9, 2023 Report summarized the Planning Commission's recommendation, which

specifically pointed out the need to "clarify" whether time share definitions excluded "shared vacation homes by family or friends":

> On April 20, 2023, the Planning Commission held a public hearing to discuss draft Zoning Code and LCP amendments.  Seven people spoke (six in favor and one against).  The Planning Commission recommended approving the amendments and suggested two additional changes for the City Council's consideration: 1) prohibit advertising time shares for sale, and 2) **_clarify time share definitions to exclude shared vacation homes by family or friends so that it is clear what is not intended_**.

(May 9, 2023 Report at 3 (emphasis added).)

243.    However, neither the May 9, 2023 Report, nor the definitions in the Ordinance, clarify this issue.  Instead, the May 9, 2023 Report merely states that, despite the confusion around whether shared vacation homes with family or friends would be prohibited under the Ordinance, the City would not change the proposed definition of a time share plan to clarify this:

> With respect to an exception to the definition of time share plan, Staff is recommending that the definition remain as proposed because the definition treats everyone equally and avoids creating a loophole that could be used to avoid regulation.  Specifically, the definition of time share plan set forth in the proposed ordinances requires several conditions be met to trigger regulation and **_does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member_**.  These conditions include: (i) the use of an accommodation; (ii) pursuant to a plan; (iii) whereby a purchaser, in exchange for consideration;

70

and (iv) receives the right to exclusively use the accommodation for less than one year during a given year, on a recurring basis for more than one year.

(*Id.* at 4 (emphasis added).)

244.   The definition and what it covers therefore remains confusing and unclear. The definition of a "time share plan," sweeps in all co-ownership structures—no matter whether they are owned by strangers or family members, either via direct purchase or inheritance.  It is thus entirely unclear how to interpret the Ordinance and proposed definition of a "time share plan" with regard to co-owners who have purchased a property together with arrangements or a plan to determine when or how each co-owner uses the property.  Residents are left to guess how to comport their conduct to comply with the Ordinance.  On one hand, the City states that "the purchase of an entire property between family and friends" is necessarily a "non-time share use," but in direct odds with this statement, the City urges that that the definition "treats everyone equally." (*Id.* at 4.)

245.   The Ordinance is further vague, ambiguous and confusing as applied by the City against Pacaso and the Existing Pacaso Homes.  While the Ordinance states that it "shall not apply to any time share use that was lawfully established prior to the effective date" of the Ordinance, NBMC § 20.48.1220(A), it fails to specifically address how Existing Pacaso Homes and their homeowners (whether those that are either being marketed or have been sold and are being managed by Pacaso) are to be treated under the Ordinance.  This leaves homeowners in the Existing Pacaso Homes (among other homeowners in other fractional ownership structures in the City) confused and guessing as to whether or not their conduct (including their use of the home, or their ability to sell their share in a home) is lawful.  This confusion prevents Pacaso and its homeowners from knowing what the law allows them to do and what it does not allow.

COMPLAINT                                                                CASE NO. 8:23-cv-01762

246.   The City of Newport Beach is a government entity acting pursuant to the Ordinance, which is an expressly adopted official policy that causes violations of the Fourteenth Amendment.  The City and its governing officials were, and are, acting under the color of law and authority in adopting and enforcing the ordinance.  The enforcement and threatened enforcement of the Ordinance against Plaintiff is an action taken under the color of law.

247.   Pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiff seeks injunctive relief against the City, whose enforcement of the vague and ambiguous Ordinance against Pacaso and the Pacaso homeowners conflicts with and violates the Fourteenth Amendment and California Constitution.

248.   Further, pursuant to 42 U.S.C. § 1983 and the Court's equitable powers, Plaintiff seeks to have the Ordinance declared void on its face and void as applied to Plaintiff, as such a vague and ambiguous ordinance conflicts with and violates the Fourteenth Amendment and California Constitution.

249.   Because the Ordinance is vague, ambiguous, and confusing, both on its face and as applied to Pacaso, and threatens ordinary, law-abiding citizens with enormous penalties for an ambiguous spectrum of conduct, it should be stricken.

## **CLAIM 7**

### **VIOLATION OF THE RIGHT OF PRIVACY**

250.   Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-249 as if fully set forth herein.

251.   Plaintiffs brings this claim on behalf of the Pacaso homeowners.

252.   The Ordinance, and the City's attempt to regulate Pacaso and Pacaso homeowners under it, is a violation of homeowners' rights to privacy, including a violation of state constitutional rights of due process and equal protection by infringing upon their fundamental right of privacy under Article I, Section 1, of the California Constitution.   These privacy rights enshrined in the California Constitution are extraordinarily broad.

253.   There is a recognized autonomy privacy interest in choosing the persons with whom a person will reside, and in excluding others from one's private residence. Pacaso homeowners have a privacy interest in coming together with co-owners to own and use a home together.  Likewise, Pacaso homeowners have a privacy interest in choosing with whom to live, in excluding others from their home, and in their private living arrangements.

254.   Pacaso homeowners have a reasonable expectation of privacy in their own home, including in their living arrangements, in how they can come together to own and enjoy property, in choosing with whom to live, and in excluding others from their home.

255.   The Ordinance seriously violates these privacy rights.  The Ordinance regulates and invades how Pacaso homeowners can come together to own and use property together, and restricts homeowners from being able to exclude others from their home.  The Ordinance intrudes into, interferes with, and restricts individuals' ability to make intimate personal decisions about their living arrangements, including who they want to co-own property with, how they want to allocate the time spent within that home, how they can use and share a home with others, and their ability to exclude others from the home.

256.   The Ordinance also regulates and invades intimate and private engagements and living arrangements, including assessing the identity of co-owners, relationships of co-owners, and manner of use of co-owners.

257.   The City even concedes that the ***identity*** of homeowners is relevant to the City's analysis as to whether the ordinance applies—stating that it "***does not inadvertently capture non-time share uses such as the purchase of an entire property between family and friends and/or the bequeathing of a property by a family member***."  (May 9, 2023 Report at 4 (emphasis added).)  The City further conceded that the identity of homeowners is relevant to the City's analysis as to whether the ordinance applies when it stated that the Ordinance "is not intended" to cover "shared

COMPLAINT                                                          CASE NO. 8:23-cv-01762

vacation homes by family or friends." (May 9, 2023 Report at 3.) In doing so, the City impermissibly intrudes upon living arrangements.

258.   The City's intrusion on the Pacaso homeowners' privacy interest is not justified by any governmental interests underlying the local zoning ordinance. Additionally, as noted above, the City's stated purposes, goals and findings underlying the ordinance are pretextual and selective, arbitrary, and not rationally related to a legitimate governmental purpose. *See supra* ¶¶ 74-85.

259.   The City cannot show a narrowly tailored means to achieve their stated goals or purposes. Instead, there are many other existing regulations and policies in place to address the supposed concerns the City had with Pacaso's properties that underly the purpose and intent of the Ordinance. *See id.*

260.   Given the City's regulation of the manner of use of co-owners based on relationships, intimate and private engagements and arrangements among friends, family members, co-workers, spouses, and separated or divorced spouses, coupled with the draconian fines and criminal penalties that a violation of the time share ordinance carries, the Ordinance is an invasion of homeowner's privacy rights.

261.   Thus, Pacaso, on behalf of its homeowners, seeks declaratory judgment and a permanent injunction barring the City from enforcing the Ordinance against them in violation of their right of privacy under Article I, Section 1, of the California Constitution.

## CLAIM 8

## DECLARATORY RELIEF: VIOLATIONS OF THE CALIFORNIA COASTAL ACT

262.   Plaintiffs adopt and reassert the allegations contained in Paragraphs 1-261 as if fully set forth herein.

263.   There is an actual controversy now existing between Plaintiffs and the City concerning the application of Ordinance No. 2023-5 against Pacaso and the Pacaso homeowners and to Pacaso-managed homes.

264.   The City has concluded definitively that Ordinance No. 2023-5 applies to Pacaso-managed homes.   The Ordinance's recitals describe the City's purported concerns with fractional-owned residences and reference discussions with Pacaso, including Pacaso's proposed alternative ordinance to regulate Pacaso-managed homes. Ordinance No. 2023-5 was proposed and enacted for the sole purpose of regulating Pacaso and the Pacaso homeowners.

265.   Ordinance No. 2023-5 amends Title 21 of the Newport Beach Municipal Code, which serves as the City's Local Coastal Program Implementation Plan pursuant to the California Coastal Act, California Public Resources Code section 30000 *et seq*. ("Coastal Act").

266.   Under the Coastal Act, each local government lying, in whole or in part, within California's coastal zone is required to prepare a local coastal program ("LCP") for the portion of the coastal zone within its jurisdiction.   Cal. Pub. Res. Code § 30500(a).   An LCP, and any amendment to an LCP, must be certified by the California Coastal Commission in order to be effective.   E.g., Cal. Pub. Res. Code § 30514(a).

267.   An LCP is a planning tool the local government must utilize to regulate development in the coastal zone consistently with the Coastal Act, and is comprised of multiple components, including a land use plan ("LUP") and measures to implement the plan, including zoning ordinances, maps, and other implementing actions, which collectively constitute the LCP's Implementation Plan ("IP").   *Id.* §§ 30108.5, 30108.6, 30122; Cal. Code Regs., tit. 14, § 13502(d).

268.   Under the Coastal Act, a local government's IP must be consistent with the certified LUP, which in turn must be consistent with the policies of Chapter 3 of the Coastal Act (commencing with California Public Resources Code section 30200). Cal. Pub. Res. Code §§ 30512(c), 30513(b).   Thus, LCPs, and any amendments to LCPs, must conform with the Coastal Act.   *Yost v. Thomas*, 36 Cal. 3d 561, 566 (1984). Indeed, the City's certified Coastal Land Use Plan ("CLUP") states, "The policies of

COMPLAINT                                                                                    CASE NO. 8:23-cv-01762

Chapter 3 of the Coastal Act ([Public Resources Code] Sections 30200-30265.5) shall be the guiding policies of the Coastal Land Use Plan."  CLUP, at p. 1-2.[1]

269.  Prior to the City's enactment of Ordinance No. 2023-5, the NBMC defined "time share use" as a "right of occupancy . .. that is not coupled with an estate in the real property."  NBMC § 20.70.020.V.  Accordingly, homes with multiple owners, such as in an LLC or trust, were not considered time share uses because each owner holds an ownership interest in the home.

270.  However, Ordinance No. 2023-5 broadened the definition of "time share uses" in Title 21 of the NBMC to include co-owned homes that are used separately by multiple owners "regardless of whether the rights of use are a result of a grant of ownership rights."  Under this broadened definition, existing co-owned homes in the City's residential coastal zoning districts could be considered prohibited time shares, fundamentally changing the use of those properties.  NBMC § 21.18 (time share uses unpermitted in residential coastal zoning districts in Newport Beach).

271.  Ordinance No. 2023-5 conflicts directly with several Coastal Act Chapter 3 policies and is inconsistent with the CLUP.  Said another way, because co-ownership advances a number of Chapter 3 and CLUP policies, prohibition of this use creates unlawful inconsistencies.

272.  Specifically, California Public Resources Code section 30210 provides that "maximum access . . . and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse."  Cal. Pub. Res. Code § 30210.  And section 30213 states that "[l]ower cost visitor and recreational facilities shall be protected, encouraged, and, where feasible, provided."  *Id.* § 30213.

---

[1] The CLUP is available here: https://www.newportbeachca.gov/government/departments/community-development/planning-division/general-plan-codes-and-regulations/local-coastal-program/coastal-land-use-plan.

These Chapter 3 policies are buttressed by several provisions in the CLUP, including, but not limited to:

273. CLUP Policy 2.2.3-1: "Lower-cost visitor and recreational facilities, including campgrounds, recreational vehicle parks, hostels, and lower-cost hotels and motels, shall be protected, encouraged and, where feasible, provided." CLUP, at p. 2-38.

274. CLUP Policy 2.3.3-2: "Encourage new overnight visitor accommodation developments to provide a range of rooms and room prices in order to serve all income ranges." CLUP at p. 2-38.

275. CLUP Policy 2.3.3-3: "Identify, protect, encourage and provide lower-cost visitor-serving and recreation facilities, including museums and interpretative centers." CLUP at p. 2-39.

276. CLUP Policy 2.3.3-4: "Encourage visitor-serving and recreational developments that provide public recreational opportunities." CLUP at p. 2-39.

277. CLUP Policy 3.1.1-1: "Protect, and where feasible, expand and enhance public access to and along the shoreline and to beaches, coastal waters, tidelands, coastal parks, and trails." CLUP at p. 3-6.

278. Co-ownership augments the stock of overnight accommodations in the coastal zone for individuals who are not fortunate enough or cannot otherwise afford to live in coastal cities on a full time basis. By providing an additional option for overnight accommodations and property ownership in the coastal zone, co-ownership homes increase coastal access overall.[2] In accordance with CLUP Policies 2.3.3-2 and 3.1.1-1, by providing homeownership opportunities for some individuals and families in the coastal zone, co-ownership units remove those same individuals and families from competing for properties in the vacation rental market and for hotel and motel

---

[2] *See, e.g.,* Cal. Coastal Com., Staff Report for City of Malibu LCP Amendment No. LCP-4-MAL-20-0083-2 (July 21, 2022), p. 2 (recognizing that increased supply in any one coastal accommodation type can "augment the stock of [all] overnight accommodations" and thereby enhance public access overall).

rooms, thereby increasing both housing rental stock and overnight accommodations and lowering demand and costs for others.    Accordingly, co-ownership facilities provide for increased coastal access for all visitors, including lower cost visitor serving uses.    Prohibiting co-ownership homes is therefore inconsistent with Coastal Act Chapter 3 policies and relevant policies of the CLUP.

279.    Further, by providing ownership opportunities to multiple individuals and families in a single vacation property, co-ownership keeps those same individuals and families from purchasing multiple, separate, lower-cost properties in coastal cities thereby helping to maintain more affordable local housing stock for fulltime residents. In addition, co-ownership increases property utilization and support for coastal businesses that comes from multiple owners consistently using a property, unlike other vacation homes in the coastal zone that are more likely to sit empty much of the time. Accordingly, co-ownership uses help support visitor and recreational uses in the coastal zone in furtherance of Chapter 3 and CLUP policies.

280.    However, by prohibiting co-ownership in residential zones, Ordinance No. 2023-5 will increase demand and costs for short-term rentals, hotels, and motels and decrease access to the coast for all coastal visitors, contradicting key Coastal Act Chapter 3 and CLUP policies.    Thus, the Ordinance does not satisfy the Coastal Act's requirements for an LCP amendment.

281.    In addition to the substantive problems with Ordinance No. 2023-5, the City unlawfully processed the Ordinance as a *de minimis* LCP amendment.    An amendment to an LCP may be considered *de minimis* only in extremely narrow circumstances and must "not propose . . . any change in the allowable use of property." Cal. Pub. Res. Code § 30514(d)(1)(B).    As noted above, Ordinance No. 2023-5 treats co-ownership of residential units in the City's coastal zone as "time share uses" that are prohibited in all residential coastal zoning districts.    Because 56% of all single-family homes in the City are owned as LLCs or in trust—structures that allow multiple owners of a property—the Ordinance could alter the use of over half of the City's

single-family homes.  Such sweeping and broad reaching regulation, imposing a novel restriction upon a previously "allowable use of property" in the coastal zone, cannot be considered *de minimis* under the Coastal Act.

282.   Further, no LCP amendment can be considered *de minimis* if it is not "consistent with the policies of Chapter 3" of the Coastal Act.  Cal. Pub. Res. Code § 30514(d)(1).   As explained above, Ordinance No. 2023-5 conflicts with multiple policies in the Coastal Act and CLUP.  Thus, the Ordinance does not qualify as a *de minimis* LCP amendment.

283.   In sum, Plaintiffs seek a judgment declaring that Ordinance No. 2023-5 be declared invalid because it is inconsistent with the Coastal Act and certified CLUP.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully prays for relief as follows:**

a)    For judgment in favor of Plaintiffs against the City on all Causes of Action;

b)    For a judgment declaring that the Ordinance is void on its face and therefore stricken;

c)    For a judgment declaring that the Ordinance is preempted and therefore stricken;

d)    For a judgment declaring that the Ordinance does not apply to Pacaso and its homeowners;

e)    For a judgment declaring that the City does not have the authority to enforce the Ordinance against Pacaso and its homeowners;

f)    For a judgment declaring that the Ordinance is stricken because it cannot satisfy the Coastal Act's requirements;

g)    For a judgment barring the City from enforcing the Ordinance against Pacaso and its homeowners;

h)    For a judgment declaring that the Existing Pacaso Homes are exempt from the Ordinance and can continue indefinitely;

COMPLAINT                                    CASE NO. 8:23-cv-01762

i)   For attorneys' fees pursuant to 42 U.S.C. § 1988(b) and California Code of Civil Procedure § 1021.5; and

j)   For such other and further relief as this Court may deem proper.

DATED: September 20, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ */s/ Lance A. Etcheverry*
LANCE A. ETCHEVERRY
Attorneys for Plaintiffs
PACASO INC., 13 CA GRIZZLY LLC, 5 CA GRIZZLY LLC, 2 CA GRIZZLY LLC, 3803 MARCUS AVENUE LLC, 307 GOLDENROD AVENUE LLC, 1703 PLAZA DEL SUR LLC, PAC 31 CA 2021 LLC, PAC 30 CA 2021 LLC, and PAC 11 CA 2021 LLC

COMPLAINT                                                    CASE NO. 8:23-cv-01762

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a trial by jury on all issues so triable.

DATED: September 20, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Lance A. Etcheverry_____

LANCE A. ETCHEVERRY
Attorneys for Plaintiffs
PACASO INC., 13 CA GRIZZLY LLC, 5 CA GRIZZLY LLC, 2 CA GRIZZLY LLC, 3803 MARCUS AVENUE LLC, 307 GOLDENROD AVENUE LLC, 1703 PLAZA DEL SUR LLC, PAC 31 CA 2021 LLC, PAC 30 CA 2021 LLC, and PAC 11 CA 2021 LLC

COMPLAINT

CASE NO. 8:23-cv-01762